L. T. PRINCE V. STATE.

No. 25,864.  January 14, 1953.
Appellant's Motion for Rehearing Denied (Without
Written Opinion) March 4, 1953.

*Fred Whitaker,* Carthage, for appellant.

*Dudley Davis,* District Attorney, Center, and *George P. Blackburn,* State's Attorney, Austin, for the state.

MORRISON, Judge.

The offense is uxoricide; the punishment, thirty years.

The opinion heretofore delivered by this court on October 29, 1952, is withdrawn, and the following is substituted therefor.

The case was tried originally in Panola County in 1949. At that trial, the appellant received a punishment of fifty years, which was by this court reversed, 155 Tex. Cr. Rep. 108, (231 S. W. 2d 419) because of the receipt in evidence of an involuntary confession.

We now review the evidence, adduced in the instant trial held in Harrison County on a change of venue, in order to test its sufficiency to support the verdict.

Davis Bailey, an attorney, testified that some six months before appellant's wife was killed she had employed him to

represent her in a divorce action against appellant, exhibiting to him at the time bruises over her face, neck and chest. He said that his client and appellant had later effected a reconciliation.

Bailey testified about several conversations with appellant prior to the homicide. On one occasion, appellant told the witness that his wife had locked him out of the house and wanted to know whether it would be lawful for him to break in the house, to which question the witness replied in the affirmative, but admonished the appellant that he had no right to knock his wife down and stomp her. On another occasion, during the pendency of the divorce proceedings, the appellant argued with the witness, contending that his wife had no interest in their homestead; appellant stated that he had offered her $500 to sign a deed thereto, and that she had refused.

Mrs. Birmingham, a neighbor of appellant's, testified about several conversations with appellant during the year preceding the homicide. On one occasion, the appellant expressed to the witness a desire that someone file a complaint in lunacy against his wife, at the same time threatening that if she continued to refuse to sign a certain deed that he would get rid of her. At another time, the appellant told the witness that he had had to pay a fine for beating up his wife and that "it was the best goddamned money I ever spent." At another meeting, the appellant told the witness that he could sell his home for $3500 and that he was willing to give his wife $500 if she would sign the deed. During their last conversation, just five days before the homicide, the appellant told the witness that he was going to give his wife a week to sign the papers and that if she did not he would kill her.

Several other witnesses corroborated the testimony of this witness that the appellant had stated that the money he had spent in paying his fine for the assault on his wife had been well spent.

Holt, the county attorney of Panola County at the time of the homicide, testified that some six months prior thereto he had charged the appellant with aggravated assault upon his wife and that appellant had plead guilty to the charge and paid a fine.

Sheriff Akins testified that, at the time of the assault by

appellant on his wife mentioned above, he had talked to him about his conduct and that appellant said, "By God . . . I am going to tell you this: I am fixing to stop this whole damn thing."

The sheriff testified further that some few days before the homicide the appellant had asked him to file a complaint in lunacy against his wife; and that when he refused the appellant asked that she be put in jail; and when he refused to do this, the appellant said, "God damn it, I will do something about it."

The sheriff also testified that when he arrived at appellant's home on the day of the homicide he found the body of appellant's wife lying lengthwise on the bed, with one arm across her breast and the hand placed exactly over the wound; that she was dead; and that a .22 calibre rifle was leaning up against the foot of the bed. The witness also stated that upon his arrival at the scene of the homicide the appellant had said, "I don't know what happened but be sure and get fingerprints"; that he did secure the services of an expert, but that no fingerprints were found on the metal portion of the gun. He stated further that he asked the appellant if he wanted to go to his wife's funeral and that appellant had replied, "Hell no."

Funeral director Hudson, after being qualified as an expert, testified that he examined the body of appellant's wife between eleven and noon on the day of the homicide and concluded that she had been dead from four to six hours and had died from a bullet wound in her left chest.

A firearms expert testified that the bullet taken from the body of deceased had been fired from the gun found at the foot of her bed.

School bus driver Blair testified that he passed appellant's home between 6:12 and 6:20 on the morning of the homicide and that a pickup truck was in the yard.

The witness Ridder testified that some two weeks prior to the homicide the appellant told him that he was having trouble with his wife and that "he was going to put a stop to it." He further testified that he saw the appellant at noon on the day of the homicide, and appellant informed him, "They have me for killing my wife." The witness stated that, upon receiving this information, he said, "You must have put a stop to it," and that appellant made no reply.

The witness Moore testified that he saw appellant on the day of the homicide and that appellant said he had found "his wife dead, but they were going to have to prove he killed her."

We now discuss the testimony of the witnesses for the defense.

Dr. Ashby testified that he examined the body of the deceased at 10:50 on the morning of the homicide and gave an opinion that she had been dead between three and a half and five hours.

The testimony of the witness Mrs. J. C. Cooper, given at a former trial, was introduced. Therein, we find that she stated that she saw appellant leave his home at six o'clock in the morning of the homicide and that she did not see him again until after ten o'clock. She testified further that in her opinion the deceased had spells of insanity.

Edward Cooper, a neighbor of appellant's, testified that appellant owned a pickup truck and that he saw a pickup leave appellant's home at six o'clock in the morning of the homicide; that sometime later he heard a loud noise, but was unable to tell from where it came, and that sometime after ten o'clock that morning he heard the appellant calling him to get a doctor.

The witness Brown testified that he saw appellant eight miles from Carthage on his way to Marshall at approximately 6:30 on the morning of the homicide.

One Nader testified that appellant was in Marshall at 7:20 on the morning of the homicide.

The witness Limbarger testified that appellant was in Marshall between 7:30 and 7:45 A. M. on the day in question.

Mrs. Jones testified that she had known the deceased during her lifetime and that in her opinion the deceased had not been of sound mind.

Mr. Parker testified to acts of indecent exposure committed by deceased before her death.

It is deducible from the above that the defense was that appellant's wife had committed suicide. Such a defensive theory

does not seem to be tenable in view of the undisputed physical facts, which include the position of the body of the deceased, the placement of her hand, the position of the gun, and the fact that no fingerprints appeared on the gun. There is no evidence of probative force pointing to any other person than appellant as the killer. The appellant's own witness places him at home at six o'clock on the morning of the homicide. The testimony of neither embalmer Hudson or physician Ashby precludes the possibility that the deceased met her death at or shortly before six o'clock. No one else was seen around the home during the appellant's absence.

We find the evidence sufficient to support the conviction.

We shall now discuss appellant's contentions raised in his able brief.

Bill of Exception No. 1 complains of the action of the court in overruling appellant's second application for continuance based upon the absence of the witness Mrs. J. C. Cooper. The trial court qualified the bill by certifying that the testimony of Mrs. J. C. Cooper given at a previous trial of this case was read to the jury and that such testimony covered all the grounds set up in the motion for continuance. The bill itself shows that it was stipulated and agreed between the state and defense that the testimony of Mrs. Cooper should be read by the court reporter and considered as evidence. No error is reflected thereby.

Bill of Exception No. 2 relates to the same question with reference to the witness R. D. Jolley. The instant trial was set for November 19, 1951. The motion for continuance was supported by the affidavit of the absent witness dated October 17, 1949. The bill recites that a motion for continuance was made at the first trial on account of the absence of the witness Jolley, and the same was supported by the instant affidavit. The bill further reflects that the witness Jolley had been subpoenaed at the former trial, but that he did not respond to the subpoena. The bill was qualified by the trial court as follows:

"The court was of the opinion there was no reasonable grounds to believe that R. D. Jolly could have been located within any reasonable time to testify in this case, and there was no grounds to believe that if the case had been continued until the next term of court that the said R. D. Jolly could have been located. That every effort had been made by the proper authorities of Harrison County, Texas, to Locate the said R. D. Jolly, but these

efforts were unsuccessful. That the County Attorney of Harrison County, Texas, advised the District Clerk of Harrison County, Texas, that Article 575 of the Code of Criminal Procedure of the State of Texas, that it was not necessary to again subpoena witnesses when a case had been transferred from one County to another on a change of venue, and that because of this law it was not necessary to again subpoena R. D. Jolly since the records showed that Jolly had been subpoenaed in Panola County, Texas.

"That on the date the motion for continuance was made, a writ of attachment was ordered issued for the witness Jolly; the defendant informed the court and prosecuting attorney that Jolly's last address was in Mineola, Wood County, Texas. That the Sheriff of Harrison County contacted the authorities in Wood County, Texas, and was informed that the witness, Jolly, had not been there in a month or more; that he had left Mineola, Wood County, Texas, had gone to San Angelo, Texas, or some town in that vicinity. The Sheriff of Harrison County contacted the authorities in the latter City, and was informed he was not there, and the defendant failed to give any information concerning the present whereabouts of said witness."

The bill as qualified shows no abuse of discretion on the part of the trial judge in overruling this second motion for continuance upon the finding that there was no reasonable ground to believe that the witness would be available at the next term.

As stated, the instant trial was begun on November 19, 1951. The motion for new trial was heard on December 27, 1951, and the appellant still had not been able to locate the witness.

We feel that it would be idle to require the court to grant a new trial when there was no showing made that the appellant would ever have been able to secure the attendance of the witness.

No abuse of discretion on the part of the trial court is shown in overruling the motion for new trial because of this absent witness.

Bill of Exception No. 5 complains of the admission in evidence of certain statements made by appellant which he contends were made while he was under arrest. The bill does not certify that the appellant was, in fact, under arrest at the time in question. The bill reflects that the objection was made after

the question had been answered; that the court sustained the objection; there was no motion made to instruct the jury to disregard the answer already made, and no exception to the ruling of the court. Such a bill fails to reflect error. Lawson v. State, 148 Tex. Cr. R. 140, 185 S. W. 2d 439.

Bills of exception Nos. 6, 7, 8, 9, and 10 relate to the admission of the testimony of Buddy Harvey. The contention is made that the witness was incompetent, because he had been convicted of a felony on April 24, 1930. This conviction was subsequent to the enactment of Article 708, C. C. P. We have held, in Lockhart v. State, 150 Tex. Cr. R. 230, 200 S. W. 2d 164, that such a witness is not incompetent.

Other complaint is made, because the trial court refused to permit the appellant to prove this conviction as impeachment of the witness Harvey. The court qualified the bill, in part, as follows:

"That at the time he (Harvey) committed the offense he was a young man, and since that time, a period of around eighteen to twenty years, the testimony showed he had conducted himself in an upright, honorable manner, and had lived an exemplary life."

This qualification shows that the conviction was too remote to be used for impeachment purposes. Branch's Ann. P. C., Sec. 170, p. 103.

Bills of Exception Nos. 11, 12, and 13 relate to admission of evidence as to appellant's conviction for aggravated assault upon his wife. We think the evidence discloses that the state discharged the burden of proof, if they had such burden, in accounting for the absence of the original documents.

Bills of Exception Nos. 17, 18, and 19 relate to jury misconduct and will require some extended discussion. The statement of facts on motion for new trial, properly filed as a separate statement of facts, together with the bills of exception, reflects the following: The judgment herein was entered on November 21, 1951; the motion for new trial was filed on November 23, 1951; and the amended motion for new trial was filed on December 27, 1951. The hearing on the amended motion was held on the same day it was filed.

When the first juror was being examined, the state interposed

an objection that the motion was not supported by an affidavit of a juror reciting the misconduct which was alleged to have occurred inside the jury room. The court indicated that he intended to sustain the objection, and appellant asked permission to amend. We think it would have been proper for the trial court to have allowed the amendment if to do so would not have unnecessarily delayed the proceedings. So thinking, we will consider the motion as amended. Careful note must be taken of the amendment proposed to be made by appellant. The bill reflects that "the only additional grounds sought to be alleged and set out in such motion was that the defendant was unable to obtain an affidavit from any of the jurors concerning such jury misconduct." We must now test the sufficiency of the motion, plus the proffered amendment.

The policy of the law is to discourage "fishing expeditions" in an effort to impeach a jury verdict. If jury misconduct has occurred, then the appellant is entitled to a hearing, but only where he has learned of such misconduct before the hearing is had. Where the misconduct was of such a nature that it would be known only by members of the jury, then an affidavit of a juror is proper. But this is not the exclusive method. Where the appellant is unable to secure such an affidavit, it is incumbent upon him to show this, and why, and, further, to show reasonable grounds for believing that such misconduct actually occurred. For illustration, this might be done by an affidavit of some person, reciting that a member of the jury had told them of misconduct, followed by affidavit of appellant or in his behalf to the effect that, though requested to do so, such juror had refused to make an affidavit thereto. This also might be done by any other method that would put the trial court on notice that misconduct had occurred. This is not done by a motion which tells the trial court, "I think misconduct has occurred and, though unable to verify it, I want to examine the jury to determine whether or not such did occur."

In the case at bar, the motion for new trial alleged misconduct which, if it occurred, necessarily occurred within the jury room. The motion was sworn to by appellant, and his proposed amendment would have added only the additional affidavit that he was unable to secure the affidavit of a juror. Read thusly, would the motion have given the trial court notice that misconduct had taken place? We think not. The trial court could just as logically deduce from such a motion that appellant's in-

ability to secure the affidavit of a juror grew out of the fact that all the jurors had denied the grounds stated in the motion.

We hold that, had the trial court allowed the amendment to be made, the motion would not have been sufficient as a pleading to require the court to hear the testimony of the jurors. Vowell v. State, 156 Tex. Cr. R. 493, 244 S. W. 2d 214.

We observe, in conclusion, that the trial court did permit the the appellant to examine as many members of the jury panel as he desired; and it appears from the testimony of several of them that the matter discussed in the jury room, about which appellant complains, had come to their knowledge during the course of their voir dire examination by appellant's counsel while they were being qualified for service in the case. We find no error reflected by these bills.

The state's motion for rehearing is granted; the judgment of reversal is set aside; and the judgment of the trial court is now affirmed.