Chris GARCIA, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 13–05–097–CR, 13–05–098–CR.

Court of Appeals of Texas,
Corpus Christi–Edinburg.

July 31, 2008.

Sean Ryan Buckley, DeGuerin & Dickson, Houston, TX, for Appellant.

Kenneth Magidson, Dist. Atty., William J. Delmore III, Chief Prosecutor, Appellate Division, Alan Curry, Asst. Dist. Atty. Houston, TX, for state.

Before Justices YAÑEZ, BENAVIDES, and VELA.

## ORDER OF ABATEMENT

Order by Justice YAÑEZ.

After a bench trial, the trial court found appellant, Chris Garcia, guilty of unlawful possession of a firearm by a felon [1] (Cause No. 13–05–097–CR) and aggravated assault with a deadly weapon (Cause No. 13–05–098–CR).[2] The court imposed a punishment of ten years' imprisonment and a $10,000 fine for the first offense, and fifty years' imprisonment and a $10,000 fine for the second offense. On appeal, appellant raises the following three issues: (1) the trial court erred in failing to conduct a hearing on appellant's motion for new trial; (2) the State withheld *Brady* material, violating appellant's federal and state constitutional rights; and (3) the State used false and misleading testimony at trial, violating appellant's federal and state constitutional rights. We abate and remand.

## I. Background

Appellant's aggravated assault conviction stemmed from a shooting incident involving Samuel Abernathy. At trial, Abernathy testified that appellant shot him twice in the early hours of July 15, 2002. The strength of the State's case against appellant was largely predicated on Abernathy's testimony, which we now summarize herein.

### A. Abernathy's Testimony

Prior to the incident in question, Abernathy had been in and out of jail on a few occasions. After his latest release from prison in June 2002, Abernathy came to be appellant's friend and employee. Appellant employed Abernathy to work as his bodyguard on weekends. According to Abernathy, appellant is "a known drug dealer" who is known to have money and own many firearms.

On the evening of July 14, 2002, Abernathy and other individuals accompanied appellant to a restaurant called Chilos. After dinner, the group returned to appellant's residence; the group was joined by mariachi performers from the restaurant. While at the residence, both Abernathy and appellant drank alcohol and used cocaine; Abernathy also consumed Xanax. As a result, Abernathy "kind of got a little too messed up." Later that night, as people began to leave the residence, the mariachis began to demand payment for their performance. Appellant refused to pay the mariachis, prompting an argument between Abernathy and appellant. At some later point, appellant and Abernathy were alone in appellant's residence, where their verbal argument continued in the living room.

Wanting to smoke a cigarette outside, Abernathy prepared to leave the living room by exiting through the residence's front door. As Abernathy was exiting the door, appellant called him back to the living room. When Abernathy closed the door and turned around to face the living room, he saw appellant pointing a gun at him. Abernathy told appellant to "[q]uit playing" and to "[p]ut the gun away." Appellant then pointed the gun at Abernathy, who was standing two feet in front of the

---

1. *See* TEX. PENAL CODE ANN. § 46.04(a)(1) (Vernon 2003).

2. *See id.* § 22.02(a)(2) (Vernon 2003).

door, and shot him in the stomach.[3] Once shot, Abernathy attempted to hit appellant in the chest; he then fell onto a table before falling to the floor. As Abernathy laid on the floor, appellant shot him in the shoulder, hitting his spine. Appellant then left the living room and went into a bedroom.

After being shot, Abernathy laid on the floor for a few minutes. While on the floor, Abernathy heard sounds coming from a bedroom, which sounded like a large object moving across the floor. Abernathy eventually walked to a phone within the residence and called 911. On more than one occasion, the 911 operator asked Abernathy who shot him, but Abernathy repeatedly replied that he did not know. The operator asked Abernathy what he was doing when he was shot, to which he replied, "We were outside." When Abernathy was asked who dragged him inside the house, he stated, "A friend of mine." When asked where this friend was now, Abernathy replied, "He left because he was scared." Abernathy testified that he did not identify appellant as the shooter during the 911 call "[b]ecause [he] was in fear of [his] life because [appellant] had shot [him] twice," and he "didn't know if he was still in the house or not." Abernathy believed that appellant may have gone to one of the bedrooms to retrieve a weapon. Furthermore, Abernathy implied at trial that his answers to the 911 operator were not accurate because he was "not coherent" and he "was going in and out." Abernathy maintained that despite his statements in the 911 call, he knew that appellant had shot him inside the residence.

Abernathy was conscious when EMS arrived. He did not inform EMS that appellant had shot him; he only stated, "That motherfucker shot me." EMS took Abernathy to the hospital, where he lapsed into a coma that lasted 68 days. Once he came out of his coma, Abernathy informed authorities that appellant had shot him. Abernathy recalled having two recorded conversations with an investigator named Jerry. The first conversation with Jerry occurred at the hospital and the second conversation occurred at Abernathy's residence.

According to Abernathy, the State gave him an immunity agreement and was compelling him to testify against appellant. He testified that he did not "like dealing with police under the circumstances" and that he was only testifying because he was compelled to do so. Abernathy asserted that, once he came out of his coma, no one told him that appellant had shot him; he remembered the night in question on his own and could recall that it was appellant who shot him. Furthermore, Abernathy testified that neither the individual named Jerry nor anyone else (1) threatened to charge him with a crime, (2) discussed the possibility of him going back to prison, or (3) offered him anything for his testimony. Abernathy contended that he only obtained an immunity agreement because of the advice of an attorney.

## B. Additional Trial Evidence

The State submitted the testimony of officers from the Houston Police Department through live testimony at trial and by submitting into evidence transcripts of testimony given at appellant's motion to

---

**3.** Abernathy's testimony was not clear as to how appellant was positioned when he first shot Abernathy. On direct examination, the prosecutor asked Abernathy if appellant was "standing up or sitting down" when he fired the first shot. Abernathy replied, "He was sitting down." On cross-examination, when asked whether appellant was sitting down, Abernathy replied, "No, he stood up."

suppress hearing. The following information stems from testimony provided by Officers V.P. Wright and Scott J. Pridie.

When Officer Wright arrived at appellant's residence, firemen and paramedics were already on the scene, but they had failed to get a response from anyone inside the residence. Abernathy eventually opened the door; he was covered in blood. Though Abernathy was able to open the front wooden door, he was unable to open a burglar-bar framed door in front of the wooden door. The burglar bars were eventually pried open by the fire department. Officer Wright observed a large amount of blood spread throughout the residence. He asked Abernathy if there was anyone else in the residence; Abernathy stated that he was unsure. Officer Wright searched the residence for additional occupants but found no one. In the course of his search, Officer Wright had to forcibly open an unlocked bedroom door because a large television was blocking the door from opening.[4]

Officer Pridie testified that the residence's front door had a hole in it, presumably caused by a bullet. Based on his assessment of the scene, Officer Pridie believed that shots were fired from inside the residence. Officers Wright and Pridie, in addition to other officers, testified that, upon entering appellant's residence, they discovered (1) guns throughout the residence, (2) stacks of money, (3) drug paraphernalia, and (4) drugs.

## C. Appellant's Motion for New Trial

Following appellant's conviction, he filed an "Amended Motion for New Trial," in which he alleged the discovery of new evidence; the motion was accompanied by three affidavits.[5] Two of the affidavits— provided by Rick DeToto (appellant's counsel) and P.M. Clinton—alleged that new evidence was acquired from discussions with an individual named Jerry Roberts.

According to Clinton's affidavit, Clinton is a private investigator who was retained by an attorney named Tommy Royce "to assist him in gathering information to help his client, Mr. Chris Garcia, who is charged with 'Aggravated Assault to Commit Serious Bodily Injury.'" The affidavit then states the following:

After receiving this assignment and having a client conference with Mr. Royce, I then proceeded to interview witnesses in this matter .... It became very clear that this case was in fact one that had been investigated by an investigator with the District Attorney's Office, who has now left the District Attorney's Office, and who works part-time for my office, a Mr. Jerry L. Roberts.

I contacted Mr. Jerry Roberts and told him that ... we were assisting Mr. Tommy Royce and hopefully getting a new trial for Mr. Chris Garcia. Mr. Roberts immediately stated that he was very familiar with the case and that he had actually worked on the case and it

4. Officer Wright testified at the motion to suppress hearing. At the hearing, he provided testimony relating to a discussion he had with an individual named Leonel Garcia. The State's brief references this discussion, but we will afford it no attention in this opinion. The testimony in question was not admitted into evidence. As explained by the trial court at appellant's trial: "So, the State is reoffering all evidence of testimony of Officers Wright and Pridie minus any hearsay testimony introduced for purposes of probable cause. So, that's admitted."

5. One of the three affidavits came from Jennifer Garcia. Appellant affords no attention to Garcia's affidavit in his brief. For this reason, and because the affidavit does not affect the manner by which we dispose of this appeal, we too will not discuss it.

was one of the last cases he had worked on before leaving the Harris County District Attorney's Office. Mr. Roberts advised me that he had become very close to the complaining witness in this case, a Mr. Samuel David Abernathy.... Mr. Roberts stated that he personally checked on Mr. Abernathy persistently to see if he would ever come out of his coma and share with him at his office what had actually happened at the time of the shooting. Mr. Roberts stated that when Mr. Abernathy finally came out of the coma, he did not have any memory to what or whom had actually shot him, but it is Mr. Roberts' opinion that this memory was being suppressed out of possibly fear of recourse by whomever had done it. During the course of physical therapy and Mr. Roberts' visits with Mr. Abernathy, his memory slowly came back.

Mr. Roberts also added that the Houston Police Department Narcotics, as well as the Pasadena Police Department, wanted with great enthusiasm, to convict Mr. Chris Garcia on this matter. The reasons for this were much greater than this shooting, but rather that they perceived Mr. Chris Garcia to be a major narcotics distributor in the Houston area. Mr. Roberts, working with Mr. Abernathy, finally resulted in a memory of the facts, and that the person who had actually shot him was Mr. Chris Garcia, while they were both high on narcotics. In my conversation with Mr. Jerry Roberts, I told him that it was our understanding that the shooting was an accident. Mr. Jerry Roberts agreed that the shooting could very well have been an accident....

While interviewing Mr. Jerry Roberts, Jerry shared with me that as they worked to reconstruct the memory of Samuel Abernathy, that they constantly had to deal with the fact that there were conflicting stories as far as what the true story was. During the period of reconstruction, they did not know what to believe or not to believe, "they" being Jone [sic] Vollman, the Assistant District Attorney, and the rest of the law enforcement officers working on the case. Joni, in hopes of bringing his memory to a sharper conclusion, advised him that he could possibly be prosecuted for possession of cocaine and weapons, and due to the fact that he was a parolee, he was facing at least 25 years for even being present the night of the shooting. [Abernathy] was advised that if his memory didn't become more clear, that [he] was at least facing 25 years for the narcotics and weapons found at the scene where he was shot. Mr. Jerry Roberts advised me that the Assistant District Attorney, Joni Vollman, had agreed to give Mr. Samuel Abernathy immunity if he would cooperate with the Harris County District Attorney's Office, Houston Police Department, and Pasadena Police Department in prosecuting and convicting Chris Garcia.

. . . .

Mr. Jerry Roberts agreed that he would help us in this matter, but that we needed to understand that Mr. Abernathy would listen and work with him, but more than likely, before he would do anything for Mr. Chris Garcia, he was probably going to want something in return.... Mr. Roberts stated that he would be happy to bring the parties to the table, but at that point he would have to bow out.... Mr. Roberts reiterated on several occasions that you could not totally trust Mr. Samuel Abernathy to tell the truth, or what you perceive the truth to be, unless you do something that will benefit him. In DeToto's affidavit, DeToto stated that he had spoken with Roberts, and that

Roberts had denied making the statements set out in Clinton's affidavit.

## II. Prosecutors Withheld *Brady* Material & Used False and Misleading Testimony

■ We begin by addressing appellant's second and third issues on appeal because they afford appellant the greatest relief if sustained (i.e., a new trial).[6] In his second issue, appellant contends his constitutional due process rights were adversely affected by the State's failure to timely disclose exculpatory evidence.[7] Under *Brady*, the prosecution has an affirmative duty to turn over favorable material evidence to the defense.[8] To find reversible error under *Brady*, a defendant must show, in part, that the State failed to disclose evidence, regardless of the prosecution's good or bad faith.[9] Appellant's attempt to show that the State failed to disclose evidence rests solely on the affidavits attached to his motion for new trial. The court of criminal appeals has stated, however, that an affidavit attached to a motion for new trial "is but a pleading that authorizes the introduction of supporting evidence. It is not evidence in itself; and in order to constitute evidence it needs to be introduced as such at the hearing on the motion"[10] Because no hearing was had on appellant's motion, appellant has failed to provide this Court with any evidence that the State failed to disclose *Brady* material. Accordingly, we overrule his second issue.

■ In his third issue, appellant argues that "[b]ased on evidence developed through Appellant's Motion for New Trial, [Abernathy's] testimony was materially false, and the State knowingly, passively, or imputedly relied on the falsity without correcting it." Because appellant relies solely on the affidavits attached to his motion to prove the State's misconduct, we similarly find—based on the reasoning articulated in issue two—that appellant has failed to provide this Court with any evidence of prosecutorial misconduct. Appellant's third issue is overruled.

## III. Failure to Conduct an Evidentiary Hearing

### A. Preservation of Error

■ Though not addressed by either party on appeal, we believe the record in this case warrants a discussion as to whether appellant has properly preserved the complained-of error for our review.[11] Appellant's motion for new trial prayed for the trial court to "set ... an evidentiary hearing and at the close thereof, grant the foregoing motion for new trial." Four orders were attached to the motion. The first and third orders—labeled "Order" and "Order on Motion for New Trial," respectively—gave the trial court the option to either deny or grant the motion for new trial. The second order, labeled "Order Presenting Motion for New Trial," gave the trial court the sole option of setting a hearing. These three orders contain spaces for the entry of dates and the trial court's signature, all of which are

---

6. *See* Tex.R.App. Proc. 43.3.

7. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

8. *Id.*

9. *Hampton v. State,* 86 S.W.3d 603, 612 (Tex. Crim.App.2002).

10. *Stephenson v. State,* 494 S.W.2d 900, 909–10 (Tex.Crim.App.1973).

11. "Preservation of error is a systemic requirement that a first-level appellate court should ordinarily review on its own motion." *Jones v. State,* 942 S.W.2d 1, 2 n. 1 (Tex.Crim. App.1997).

blank. The fourth order, labeled "Order Presenting Amended Motion for New Trial," was a modified version of the second order. The fourth order, which is signed by the trial judge, contains handwriting that alters the typed language, turning the order into an acknowledgment that the "[m]otion was timely presented on the 5th day of Nov., 2004." This order neither grants nor denies the motion for rehearing or the request for an evidentiary hearing, but simply establishes presentation of the motion.

■ In order for an appellate court to address whether the trial court erred in denying an evidentiary hearing on a motion for new trial, the defendant must present the motion for new trial to the trial court and request a hearing.[12] In *Carranza v. State,* the court of criminal appeals stated that

> presentment must be directed to the trial court or another authorized to act on behalf of the trial court. The presentment must result in actual notice to the trial court and may be evidenced by the judge's signature or notation on a proposed order or by a hearing date set on the docket.[13]

In *Rozell v. State,* the court of criminal appeals held that no request for a hearing had been made when the appellant did not request a hearing in the motion, and "[t]he order attached to the motion ... included the options of having a hearing or ruling on the motion without a hearing, which, without a more specific request, left to the trial court's discretion whether a hearing should be held."[14] The court reasoned that presenting the motion for new trial and the request for a hearing was akin to objecting to the erroneous admission of evidence, stating:

> Absent a proper objection that alerts the trial court to the erroneous admission, the error has not been preserved for appellate review. Thus, a reviewing court does not reach the question of whether a trial court abused its discretion in failing to hold a hearing if no request for a hearing was presented to it.[15]

We find that appellant's motion satisfied the presentment requirement set out in *Carranza* through the attached fourth order. Whether or not appellant suitably requested a hearing is a more difficult question to answer in light of *Rozell.* While appellant's motion did request a hearing in its prayer and contained an order that gave the trial court the sole option of setting a hearing, it is arguable that the motion's multiple orders left to the trial court's discretion whether a hearing should be held. Ultimately, given that the facts of the instant case are distinguishable from those in *Rozell,* we find that appellant adequately advised the trial court of his desire to have a hearing.

■ Though appellant presented his motion for new trial to the trial court and requested a hearing, it was imperative for appellant to also obtain a ruling on the motion.[16] As explained by the Austin Court of Appeals in *Oestrick v. State:*

> In order to preserve a complaint for appellate review, the complaining party must have obtained a ruling on any request, motion, or objection. There is no

---

12. *See Rozell v. State,* 176 S.W.3d 228, 230 (Tex.Crim.App.2005).

13. *Carranza v. State,* 960 S.W.2d 76, 81 (Tex. Crim.App.1998).

14. *Rozell,* 176 S.W.3d at 231.

15. *Id.* at 230.

16. *See Oestrick v. State,* 939 S.W.2d 232, 235 (Tex.App.–Austin 1997, pet. ref'd).

indication in this record that the district court ever refused to conduct a hearing on appellant's motion for new trial. Indeed, there is no indication that appellant ever attempted to schedule such a hearing or specifically brought to the trial court's attention his desire for one. Although appellant's motion for new trial contained a request for a hearing in the prayer for relief, surely the responsibility for obtaining a setting for such a hearing falls on the party seeking it, not on the trial judge. Where a motion for new trial is overruled by operation of law, the trial court's failure to conduct a hearing, without more, is simply a "failure to rule" on the request for a hearing. . . .

. . . .

Having failed to obtain a ruling on his request for a hearing—*or at least a written order overruling his motion for new trial*—and having failed to object to the lack of a ruling, appellant has not preserved this complaint for appellate review.[17]

From the face of appellant's motion for new trial, it appears that the motion was overruled by operation of law. The trial court's docket sheet, however, reveals that the trial court did in fact rule on the motion. A notation in the docket sheet indicates that the court overruled the motion on November 24, 2004–within 75 days

after appellant's sentence was imposed in open court.[18] The docket sheet does not indicate that the trial court specifically overruled appellant's request for a hearing. Nevertheless, based on the trial court's overruling of appellant's motion for new trial—which makes this case factually distinguishable from *Oestrick*—we find that the trial court implicitly overruled appellant's request for a hearing.[19] As a consequence, we deem that appellant has preserved his complained of error for appellate review.

### B.  Applicable Law

■■■■ As a prerequisite to obtaining a hearing and as a matter of pleading, motions for new trial must be supported by affidavit, either of the accused or someone else, specifically showing the truth of the grounds of attack.[20] An affidavit that states only conclusory allegations without supporting facts fails the showing required and is insufficient to warrant an evidentiary hearing on the motion for new trial.[21] A defendant will be entitled to an evidentiary hearing if his "motion and accompanying affidavit(s) raise matters not determinable from the record, upon which the accused could be entitled to relief."[22] The affidavit is not required to reflect every component legally required to establish relief, but either the motion itself or the affidavit must show that reasonable grounds exist to grant relief.[23] If the trial

**17.**  *Id.* (emphasis added; citations and footnotes omitted); *see also Cates v. State*, No. 13–95–325–CR, 1997 Tex.App. LEXIS 4833, at *26 (Tex.App.–Corpus Christi Aug. 28, 1997, no pet.) (mem. op.) (following and applying the reasoning laid out in *Oestrick* ).

**18.**  *See* Tex.R.App P. 21.8.

**19.**  "A court's ruling on a complaint or objection can be impliedly rather than expressly made. A trial court's ruling on a matter need not be expressly stated if its actions or other statements otherwise unquestionably indicate

a ruling." *Rey v. State*, 897 S.W.2d 333, 336 (Tex.Crim.App.1995) (citations omitted).

**20.**  *Martinez v. State*, 74 S.W.3d 19, 21–22 (Tex.Crim.App.2002).

**21.**  *See Jordan v. State*, 883 S.W.2d 664, 665 (Tex.Crim.App.1994).

**22.**  *Lucero v. State*, 246 S.W.3d 86, 94 (Tex. Crim.App.2008).

**23.**  *See Jordan*, 883 S.W.2d at 665.

court denies a hearing on the motion for new trial and the defendant appeals from that denial, the appellate court must review the trial court's decision for an abuse of discretion.[24]

## C. Are Appellant's Affidavits Deficient? [25]

▮ The court of criminal appeals has stated that a "motion for new trial which points out extraneous matters which are necessarily hearsay as to the accused must have attached thereto the affidavit of some person who has knowledge of the facts or must name the source of defendant's information ... or must state some reason or excuse for failing to produce the affidavits."[26] In *Prince v. State,* the court of criminal appeals discussed the affidavits a defendant should submit along with a motion for new trial based on alleged juror misconduct, stating:

Where the misconduct was of such a nature that it would be known only by members of the jury, then an affidavit of a juror is proper. But this is not the exclusive method. Where the appellant is unable to secure such an affidavit, it is incumbent upon him to show this, and why, and, further, to show reasonable grounds for believing that such misconduct actually occurred. For illustration, this might be done by an affidavit of some person, reciting that a member of the jury had told them of misconduct, followed by affidavit of appellant or in his behalf to the effect that, though re-

quested to do so, such juror had refused to make an affidavit thereto.[27]

Three years after *Prince* was decided, the court of criminal appeals, in *Clark v. State,*[28] addressed an appellant's claim that the trial court had erred in denying his motion for new trial without a suitable hearing. The motion for new trial, which alleged jury misconduct, was accompanied by an affidavit from the appellant's counsel. In the affidavit, counsel stated the following information, which was allegedly provided to him by the jury foreman:

The foreman of the jury informed the bailiff that the jury desired information concerning the suspended sentence law, what it meant and how it worked. The bailiff in charge of the jury proceeded to advise the foreman of the jury concerning the law of a suspended sentence, telling him what it meant and what would be required of the defendant if he were granted a suspended sentence. The bailiff further advised the foreman of the jury that if defendant was granted a suspended sentence he would leave the court room free. That at the time of this conversation between the foreman of the jury and the bailiff the jury had voted 10 to 2 in favor of granting the defendant a suspended sentence. After the foreman of the jury conveyed the information he had received from the bailiff to the other jurors the jury returned a verdict against the defendant assessing his punishment at 2 years in the state penitentiary and did not rec-

---

**24.** *Martinez,* 74 S.W.3d at 22.

**25.** An appellate court may properly affirm the denial of a hearing on a motion for new trial if any theory of law can support the denial, even if the theory was not raised by the State. *See id.* at 21. We thus raise and address the concerns discussed in this section, even though they were not raised by the State.

**26.** *Bearden v. State,* 648 S.W.2d 688, 690 (Tex. Crim.App.1983) (citing *Vyvial v. State,* 111 Tex.Crim. 111, 10 S.W.2d 83, 84 (1928) (op. on reh'g)).

**27.** *Prince v. State,* 158 Tex.Crim. 320, 254 S.W.2d 1006, 1011 (1953).

**28.** *Clark v. State,* 163 Tex.Crim. 54, 289 S.W.2d 288 (1956).

ommend that his sentence be suspended.[29]

The affidavit further stated that counsel had been unable to get the foreman to submit an affidavit because the foreman advised the attorney " 'that he would make no further statements and would do nothing further in regards to the matter and as far as he was concerned the case was closed.' " [30] The court of criminal appeals observed that the appellant had requested the trial court to summon jury members and the bailiff so "that they might be examined touching the facts set forth in the affidavit," but the trial court refused the request and only permitted the "appellant's counsel to testify to the same facts in more detail than set forth in the affidavit." [31] The court of criminal appeals held "that the trial court erred in refusing appellant the right to have the benefit of the testimony of the jurors, as well as that of the bailiff, in support of his contention of jury misconduct."[32] Relying on its previous holdings in *Prince* and *Vyvial,* the court explained:

> In matters of alleged jury misconduct, especially that which is alleged to have occurred within the jury room, this court has required something more than a mere allegation thereof in order to circumvent "fishing expeditions."
>
> From time to time we have pointed out the advisability of an affidavit of a member of the jury attesting the facts relied upon to show misconduct. We have held, however, that such an affida-

vit is not absolutely necessary but that the failure to secure it might satisfactorily be explained or accounted for, in which event it would be the duty of the trial court to hear evidence in support of the allegations.

> We are constrained to here conclude that the appellant has brought himself within the rule authorizing introduction of the testimony of the jurors upon the hearing of the motion for new trial.[33]

The San Antonio Court of Appeals also relied on *Prince* in *De Leon v. State,* wherein the court determined that a defendant's hearsay affidavits were sufficient to meet the requisites for raising the issue of jury misconduct, stating:

> The affidavit in the case before us is that of Mr. Robert G. Reyes, a private investigator hired by defense counsel. The State argues that the affidavit submitted by appellant in support of his motion for new trial is insufficient since it is not the affidavit of "jurors or some other individual in a position to know the facts." An affidavit of a juror is proper, but it is not the exclusive method. Where the appellant is unable to secure such an affidavit, it is incumbent upon him to show this. This might be done by an affidavit of some person, reciting that a member of the jury had told them of misconduct, followed by an affidavit to the effect that though requested to do so, such juror had refused to make an affidavit thereto.

---

29. *Id.* at 289.

30. *Id.* at 289–90. We also note that the appellant's counsel concluded his affidavit by stating, " 'your affiant believes and has reasons to believe that the foregoing facts are true and correct.' " *Id.* at 290. The affidavits in the case now before this Court contain similar language. DeToto's affidavit states, "I have reviewed the foregoing document and state under oath that the facts contained

therein are true and correct to the best of my knowledge." Clinton's affidavit states, "The above statement is true and correct to the best of my knowledge."

31. *Id.* at 290.

32. *Id.* at 291.

33. *Id.* at 290–91.

A review of the affidavit in the instant case, reveals that it meets the requisites for raising the issue of jury misconduct as set out in *Prince* ....[34]

Though *Prince* relates to a motion for new trial on the basis of jury misconduct, rather than newly discovered evidence, its discussion of what a defendant should do when unable to obtain the affidavit of someone with personal knowledge of the facts remains instructive in the instant case. Appellant's motion for new trial did not include the affidavit of some person who has knowledge of the facts (i.e., an affidavit from Jerry Roberts was not included). Appellant did provide, however, an affidavit of some person (Clinton), reciting that Roberts told him of information that constituted newly discovered evidence favorable to appellant, followed by an affidavit of someone in appellant's behalf (De-Toto) stating that, though requested to do so, Roberts had refused to make an affidavit thereto.[35] Therefore, the trial court could not have denied appellant a hearing based on his failure to provide the affidavit

of Roberts, or some person who has personal knowledge of the facts.[36]

Though appellant can circumvent the requirement of submitting an affidavit of some person who has personal knowledge of the facts, he cannot do so by relying on an affidavit that contains multiple levels of hearsay.[37] In his affidavit, Clinton claims that Roberts made various statements of fact to him. It is difficult to fully decipher, however, whether or not these statements were derived from Roberts' personal knowledge. The statements that we find particularly noteworthy are the following:

Mr. Roberts stated that he personally checked on Mr. Abernathy persistently to see if he would ever come out of his coma.... Mr. Roberts stated that when Mr. Abernathy finally came out of the coma, he did not have any memory to what or whom had actually shot him....

....

While interviewing Mr. Jerry Roberts, Jerry shared with me that as they worked to reconstruct the memory of Samuel Abernathy, that they constantly had to deal with the fact that there were

**34.** *De Leon v. State*, 657 S.W.2d 160, 165–66 (Tex.App.San Antonio 1983, no pet); *see also Stowe v. State*, 745 S.W.2d 568, 570 (Tex. App.–Houston [1st Dist] 1988, no pet).

**35.** *See Prince*, 254 S.W.2d at 1011. Though DeToto's affidavit does not explicitly state that Roberts refused to provide an affidavit, we believe the affidavit implicitly makes this contention through DeToto's statement that he had spoken with Roberts and that Roberts had denied making the statements.

**36.** Because we have found, based on the reasoning already discussed in this section, that appellant's affidavits are not deficient, we need not address whether appellant's affidavits are sufficient on some other basis. More specifically, we need not consider whether Roberts' alleged statements to Clinton are admissible through Clinton because they constitute an admission by party-opponent. *See* Tex.R. Evid. 801(e)(2); *Rodela v. State*, 829

S.W.2d 845, 847–50 (Tex.App.–Houston [1st Dist] 1992, pet. ref'd) (holding that a witness could testify about statements made to him by a police department investigator because the statements were an admission by party-opponent and were thus not excluded by the hearsay rule); *see generally* Randolph N. Jonakait, *The Supreme Court, Plain Meaning, and the Changed Rules of Evidence*, 68 Tex. L.Rev. 745,774–78 (1990); Edward J. Imwinkelried, *Of Evidence and Equal Protection: The Unconstitutionality of Excluding Government Agents' Statements Offered as Vicarious Admissions Against the Prosecution*, 71 Minn. L.Rev. 269,305–312(1986).

**37.** *See Rumfield v. State*, 98 Tex.Crim. 158, 265 S.W. 153, 154–55 (1924); *see also Lingo–Perkins v. State*, No. 12–05–00171–CR, 2006 WL 1549994, **3–5, 2006 Tex.App. LEXIS 4877, at *6–7 (Tex.App.–Tyler June 7, 2006, no pet.) (mem. op., not designated for publication).

conflicting stories as far as what the true story was.... [Abernathy] was advised that if his memory didn't become more clear, that was [sic] at least facing 25 years for the narcotics and weapons found at the scene where he was shot.

Determining what statements, if any, stem from Roberts' personal knowledge should be determined by an evidentiary hearing, rather than through Clinton's affidavit alone. The purpose of a hearing on a motion for new trial is to give the defendant an opportunity to fully develop the matters raised in his motion.[38] The court of criminal appeals has recognized that "the hearing on a motion for new trial is a critical stage of the proceedings. It is the only opportunity to present to the trial court certain matters that may warrant a new trial, and to make a record on those matters for appellate review."[39] Because appellant has not been afforded an opportunity to make a record addressing the concern at hand, we find it inappropriate to affirm the trial court's denial based on the mere possibility that the statements attributable to Roberts are not within his personal knowledge.[40]

**D. The State's Arguments**

The State first argues that appellant's motion for new trial and its supporting affidavits "did not articulate reasonable grounds for the granting of a new trial" because "the alleged newly discovered evidence was only collateral."[41] In *Ramirez*

*v. State,* the court of criminal appeals stated:

The general rule is that a party is not entitled to impeach a witness on a collateral matter. The test as to whether a matter is collateral is whether the cross-examining party would be entitled to prove it as a part of his case tending to establish his plea....

There is, however, an exception to the general rule that a party is not entitled to impeach a witness on a collateral matter. When a witness leaves a false impression concerning a matter relating to his or her credibility, the opposing party is allowed to correct that false impression. For example, when the witness, by his direct testimony, leaves a false impression of his "trouble" with the police, it is legitimate cross-examination to prove that the witness had been "in trouble" on occasions other than those about which he offered direct testimony.[42]

Unquestionably, appellant would have been entitled to rely on evidence in his case-in-chief that Abernathy had no memory of who shot him when he awoke from his coma and that he was pressured by law enforcement and/or the district attorney's office to implicate appellant in the shooting. Moreover, the statements attributed to Roberts could seemingly be used to correct a false impression, namely, Abernathy's testimony that no one pressured him to implicate appellant in the shooting. We thus reject the State's first argument.

---

**38.** *Wallace v. State,* 106 S.W.3d 103, 108 (Tex. Crim.App.2003).

**39.** *Trevino v. State,* 565 S.W.2d 938, 940 (Tex. Crim.App.1978).

**40.** *See Bahm v. State,* 219 S.W.3d 391, 396 (Tex.Crim.App.2007) ("The particulars of who learned what at what time is something that can be ascertained at the evidentiary hearing that the trial court denied.").

**41.** The State cites *Espinoza v. State,* 185 S.W.3d 1, 6–7 (Tex.App.–San Antonio 2005, no pet.), in support of its argument.

**42.** *Ramirez v. State,* 802 S.W.2d 674, 675–76 (Tex.Crim.App.1990) (citations and quotations omitted).

In its remaining two arguments, the State asserts that the trial court could have properly denied appellant a hearing because the new evidence is not "probably true" (second argument) and it would not "probably bring about a different result in a new trial" (third argument). In its second argument, the State specifically asserts that because appellant's motion for new trial states that Roberts has denied making the statements set out in Clinton's affidavit, "[t]he trial court would have been well within [its] discretion in determining that the affidavit attached to the appellant's motions for new trial was not 'probably true' and, therefore, did not show 'reasonable grounds' for granting the appellant a new trial." The State is essentially asserting that the trial court may have denied a hearing because it called into question whether appellant's newly discovered evidence actually existed. In its third argument, the State, relying on the court of criminal appeals' opinion in *Wallace v. State*,[43] contends that the trial court could have denied the hearing because the new evidence was not compelling enough to "probably bring about a different result in a new trial."

The State's arguments utilize language from standards that were designed to dictate when a defendant is entitled to a new trial (rather than a hearing) based on newly discovered evidence. In articulating those standards in *Wallace*, the court of criminal appeals stated that

> a defendant is entitled to have his motion for new trial granted if (1) the newly discovered evidence was unknown to him at the time of trial; (2) his failure to discover the new evidence was not due to his lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is *probably true* and will *probably bring about a different result in a new trial.*[44]

The court in *Wallace* then went on to criticize the court of appeals for using the above standards to determine whether the trial court erred in denying a *hearing* on a motion for new trial. The court stated:

> To be sufficient to entitle the defendant to a hearing, the motion for new trial and accompanying affidavit(s) need not establish a prima facie case for a new trial. Rather, they must merely reflect that reasonable grounds exist for holding that such relief could be granted....
>
> It is apparent on the face of the court of appeals' opinion that the court used the wrong legal standard when it addressed appellant's claim that the trial court erred in denying his request for a hearing on his motion for new trial. The court of appeals asked only whether, on this record, the trial court could have reasonably denied appellant's motion for new trial, when the court of appeals should have asked whether, on this record, the trial court could have reasonably denied appellant a *hearing* on his motion for new trial.[45]

Rather than remand the case to the court of appeals so that it might apply the correct legal standard to the appellant's claim, the court instead proceeded to explain why the court of appeals nonetheless reached the correct result in the case.[46] In so doing, the court, paradoxically, borrowed from the same "wrong" legal standard it

---

43. *See Wallace*, 106 S.W.3d at 108 (citing *Keeter v. State*, 74 S.W.3d 31, 36–37 (Tex. Crim.App.2002)).

44. *Id.* (emphasis added).

45. *id.* (quotations and citations omitted; emphasis in original).

46. *Id.*

chastised the court of appeals for using, stating:

> On this record, the trial court could have reasonably concluded (a) that the strength of the prosecution's case was such that the new evidence suggested by the appellant's motions and the attached affidavits, even if true, was not compelling enough to *probably bring about a different result in a new trial,* and, therefore, (b) that the appellant's motions and accompanying affidavits did not show that he could be entitled to relief.[47]

We take issue with the *Wallace* court's application of the standard. Under the court's reasoning, the appellant failed to satisfy the legal standard applicable to a trial court's *denial of a hearing* (i.e., his evidence "did not show that he *could* be entitled to relief")[48] because he failed to satisfy the fourth prong of the legal standard applicable to a trial court's *denial of a motion for new trial* (i.e., his evidence was not compelling enough to *"probably bring about a different result"*).[49] We find it difficult to decipher how the court of criminal appeals' applied a legal standard different from the one employed by the court of appeals. Moreover, we are left pondering the following question: If a trial court can rightfully deny a defendant a *hearing* because of his failure to satisfy the fourth prong governing the denial of a *motion for new trial,* can it not also deny a hearing based on a defendant's failure to satisfy any one of the four prongs?

In *McIntire v. State,* the court of criminal appeals reversed this Court's "holding that the trial court did not abuse its discretion in failing to grant a hearing on appel- lant's motion for new trial."[50] The court of criminal appeals criticized this Court's holding as follows:

> The court of appeals examined each of these grounds for new trial in turn, and, based upon "the record itself and ... the juror's affidavit," agreed with the trial court that the motion for new trial "presented nothing for hearing." Hav- ing found the affidavit insufficient to establish any complete grounds for new trial, the court of appeals then ruled, paradoxically, that the juror's affidavit was all the trial court needed to dispose of appellant's claims, and overruled his contention that he had an absolute right to have his motion heard.
>
> In essence the court of appeals thus ruled that an affidavit attached to a mo- tion for new trial must establish a *prima facie* case for at least one cognizable ground for new trial before a hearing on the motion is required. In this the court of appeals erred. This Court has never articulated such a requirement.
>
> ... Never has the Court held ... that before a hearing is necessitated the affi- davits must reflect every component le- gally required to establish a claim of jury misconduct.
>
> ...
>
> As a matter of pleading and as a prerequisite to obtaining a hearing, keeping in mind that the purpose of the affidavit requirement is to limit the pa- rameters of the hearing that is sought, we hold that an affidavit is sufficient if it demonstrates that reasonable grounds exist for believing that jury misconduct occurred, a quotient verdict was agreed

---

47. *Id.* (emphasis added).

48. *See Martinez,* 74 S.W.3d at 22 (emphasis added).

49. *See Keeter,* 74 S.W.3d at 36–37 (emphasis added).

50. *McIntire v. State,* 698 S.W.2d 652, 661 (Tex.Crim.App.1985).

upon, or a juror conversed with an unauthorized person regarding the case.[51]

In light of *McIntire*, it would appear as if the answer to our previously raised question is "no": a trial court cannot deny a hearing—due to a defendant's failure to satisfy all four prongs of the legal standard applicable to a trial court's denial of a motion for new trial based on newly discovered evidence—because the court of criminal appeals "has never articulated" a requirement compelling a defendant to establish a *prima facie* case for a new trial in order to obtain a hearing. Regardless of what the court of criminal appeals has or has not articulated, however, the reasoning employed in *Wallace*—wittingly, or unwittingly-enables appellate courts to require defendants to raise a *prima facie* case in order to obtain a hearing.

Cases exist in which the State or an appellate court has asserted that a defendant should be denied a hearing on his motion for new trial based on newly discovered evidence because the motion and affidavits failed to establish either that (1) the newly discovered evidence was unknown to him at the time of trial;[52] (2) his failure to discover the new evidence was not due to this lack of due diligence;[53] or (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching.[54] *Wallace*—by upholding the trial court's denial of a hearing based on the failure of the defendant's affidavits to show that the new evidence will probably bring about a different result at trial-allows the State and lower courts to require that defendants satisfy the fourth and final prong of a standard meant to govern a trial court's denial of a motion for new trial. Though the court of criminal appeals stated in *Reyes*,[55] *Jordan*,[56] *Martinez*,[57] and *Wallace*[58] that a defendant is entitled to a hearing if his motion and affidavits merely "reflect that reasonable grounds exist for holding that such relief *could* be granted," the court's reasoning in *Wallace* appears to alter the law by requiring a defendant to prove that relief *will be* granted.

---

**51.** *Id.* at 657–58 (citations and footnotes omitted).

**52.** *See Hurtado v. State*, No. 05–98–00450–CR, 1999 WL 715015, **7–10, 1999 Tex.App. LEXIS 6956, at *15–16 (Tex.App.–Dallas Sept. 15, 1999, no pet.) (not designated for publication) (finding, despite State's contrary contention, that "appellant's affidavits raise reasonable grounds that newly discovered evidence exists that was unknown to him at the time of trial").

**53.** *See House v. State*, No. 07–96–0088–CR, 1996 WL 694334, **5–9, 1996 Tex.App. LEXIS 5354, at *8–11 (Tex.App.–Amarillo Dec. 4, 1996, no pet.) (not designated for publication) (finding that trial court did not err in denying appellant a hearing on his motion for new trial because "[a]ppellant did not present an affidavit ... in support of his assertion that the failure to discover [the new evidence] prior to trial was not due to lack of diligence"). We observe that this Court has refused to require a defendant to make this showing in order to obtain a hearing. *See*

*Hernandez v. State*, 989 S.W.2d 796, 797 (Tex. App.–Corpus Christi 1999, no pet.) ("The State responds that a hearing was properly denied because Hernandez failed to show that he had exercised 'due diligence' in discovering the evidence in question. Due diligence, however, is a substantive requirement for a new trial and a defendant need not present a prima facie case for a new trial in order to get a hearing.").

**54.** *See, e.g., Espinoza v. State*, 185 S.W.3d 1, 6–7 (Tex.App.–San Antonio 2005, no pet).

**55.** *Reyes v. State*, 849 S.W.2d 812, 816 (Tex. Crim.App.1993) (emphasis added).

**56.** *Jordan*, 883 S.W.2d at 665 (emphasis added).

**57.** *Martinez*, 74 S.W.3d at 21 (quoting *Jordan*, 883 S.W.2d at 665) (emphasis added).

**58.** *Wallace*, 106 S.W.3d at 108 (quoting *Martinez*, 74 S.W.3d at 21) (emphasis added).

When a defendant seeks a new trial by raising a motion for new trial based on newly discovered evidence, his toughest task will likely be proving to the trial court that the new evidence is probably true and will probably bring about a different result in a new trial. This task is made even more difficult when a defendant is forced to make this showing without the aid of an evidentiary hearing, which is the defendant's "only opportunity to present to the trial court certain matters that may warrant a new trial, and to make a record on those matters for appellate review."[59]

There are undoubtedly many cases in which newly discovered evidence set out in an affidavit is overwhelmed by the trial evidence that proved the defendant's guilt. When faced with such a case, we understand that a trial court will likely view a hearing addressing the new evidence as a wasteful and pointless task.[60] There are undoubtedly other cases, however, in which the trial evidence used to convict the defendant was limited and the defendant's newly discovered evidence is not easily summarized nor synthesized into words in an affidavit.[61] In such cases, it is difficult to imagine how an appellate court—without an appellate record exploring the new evidence—can confidently find, as required by *Wallace*,[62] that a trial court erred in determining that the new evidence was not compelling enough to probably bring about a different result in a new trial, and thus find that the court abused its discretion in denying a hearing. Similarly, it is equally difficult to imagine how an appellate court, in fairness to a defendant, can conclude that the trial court was free to deny a hearing because the new evidence (albeit unexplored and undeveloped) was not compelling enough to probably bring about a different result in a new trial.

■ Following the court of criminal appeals' decision in *McIntire*,[63] as well as its recent decision in *Bahm v. State*,[64] we will not deny appellant a hearing because he has failed to raise a *prima facie* case for a new trial. Accordingly, we will not decide whether or not appellant's motion and affidavits established that the new evidence was probably true and would probably bring about a different result in a new trial.[65] We have decided, however, that appellant's motion and affidavits "reflect that reasonable grounds exist for holding that such relief *could* be granted."[66] The fact that the motion and affidavits opened the door of *possibility* toward establishing a *prima facie* case for a new trial should have entitled appellant to an evidentiary

---

59. *Trevino,* 565 S.W.2d at 940.

60. It is quite likely that the court of criminal appeals had this thought in mind when it employed its reasoning in *Wallace.* In that case, the court noted that "at appellant's trial five eyewitnesses, including the victim, positively identified appellant as the assailant" and "[t]wo other witnesses testified that they saw appellant leave the crime scene carrying a baseball bat." *Wallace,* 106 S.W.3d at 108.

61. We believe the instant case is one of these cases.

62. *See Wallace,* 106 S.W.3d at 108.

63. *See McIntire,* 698 S.W.2d at 658.

64. *Bahm,* 219 S.W.3d at 396 ("While the court of appeals used the words 'reasonable grounds,' its emphasis on proof in its analysis appears to conflict with its earlier statement that an appellant does not need to establish a prima facie case to obtain a hearing on his motion for new trial.").

65. If an appellate court made such a determination in favor of an appellant and thus remanded the case to the trial court, what determinations would remain for the trial court to make at the hearing?

66. *Wallace,* 106 S.W.3d at 108 (emphasis added).

hearing. In failing to hold a hearing, the trial court- "abdicate[d] its fact finding function and denie[d] the accused a meaningful appellate review." [67] We thus reject the State's remaining arguments and find that the trial court abused its discretion in failing to hold a hearing on appellant's motion for new trial.[68] We sustain appellant's first issue on appeal.[69]

## IV. Conclusion

These appeals are abated for sixty days and the causes remanded to the trial court for a hearing on appellant's motion for new trial.[70] If the trial court grants the motion, it must immediately forward a copy of the order granting the motion to this Court, upon receipt of which we will dismiss appellant's appeals.[71] If the motion is overruled, the record will be supplemented and the parties will be permitted to brief any issues relating to the overruling of the motion.[72] The trial court is ordered to conduct a hearing on the motion for new trial. Any ruling is to be included in a supplemental clerk's record and transmitted to this Court, along with a reporter's record of the hearing.

These appeals are abated, treated as closed cases, and removed from this Court's active docket. The appeals will be reinstated on this Court's active docket only when the supplemental clerk's record is filed in this Court. The Court will consider an appropriate motion to reinstate the appeal filed by either party, or the Court may reinstate the appeal on its own motion. It is appellant's responsibili-

---

67. *McIntire*, 698 S.W.2d at 660; *see McMillan v. State*, 769 S.W.2d 675, 677 (Tex.App.–Dallas 1989, pet. ref'd) (holding that "by denying [the defendant] a hearing on his motion for new trial, the trial court abdicated its fact finding function and effectively prevented [the defendant] from making a record sufficient to challenge on appeal the policy about which he complains").

68. *See id.*

69. The instant case was transferred to this Court from the First Court of Appeals. On March 10, 2008, the Texas Supreme Court ordered a number of amendments to the Texas Rules of Appellate Procedure; these amendments take effect on September 1, 2008. *See* Order Amending Texas Rules of Appellate Procedure, Mar. 10, 2008 (Tex. Misc. Docket No. 08–9017). One of these amendments is the addition of Texas Rule of Appellate Procedure 41.3. Rule 41.3 states:

> In cases transferred by the Supreme Court from one court of appeals to another, the court of appeals to which the case is transferred must decide the case in accordance with the precedent of the transferor court under principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court. The court's opinion may state whether the outcome would have been

different had the transferee court not been required to decide the case in accordance with the transferor court's precedent. *Id.* Though not yet bound by this rule, we wish to note that we do not believe that the First Court's precedent is inconsistent with either the legal reasoning employed or the result reached herein. *See Rozell v. State*, 137 S.W.3d 106, 108 (Tex.App.–Houston [1st Dist.] 2004), *aff'd*, 176 S.W.3d 228 (Tex.Crim. App.2005).

70. We note that our order of abatement in this case differs from a typical abatement for findings of fact and conclusions of law. The typical abatement is an interlocutory decision by this Court and is not appealable. *See Price v. State*, 826 S.W.2d 947, 948 (Tex.Crim.App. 1992). The abatement in this case is a final, appealable decision. *See id.*

71. An appeal by the State from an order granting a new trial would be a separate proceeding. *See* Tex.Code Crim. Proc. Ann. art. 44.01(a)(3) (Vernon Supp.2007).

72. Appellant will have fifteen days, following the day of reinstatement, to file a supplemental brief addressing issues raised at the new trial hearing or to inform this Court that no supplemental brief will be filed. The State will have fifteen days to respond to appellant's brief.

ty to request a hearing date from the trial court and to schedule a hearing in compliance with this Court's order. If the parties do not request a hearing, the court coordinator of the trial court shall set a hearing date and notify the parties of such date.