**Opinion issued October 1, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-19-00774-CR**
**NO. 01-19-00775-CR**

———————————

**MICHAEL DEWEY SIRRATT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Case Nos. 18CR2368 & 18CR2369**

## MEMORANDUM OPINION

A jury convicted appellant, Michael Dewey Sirratt, of the offenses of aggravated assault of a family member and aggravated assault. After finding appellant guilty as charged in the indictments, the jury assessed his punishment at 50 years' confinement for the aggravated-assault-of-a-family-member conviction

and 10 years' confinement for the aggravated-assault conviction. In his sole issue, appellant contends that the trial court should have sua sponte ordered a psychiatric review, arguing that evidence adduced at trial raised the issue of insanity. We affirm.

## BACKGROUND

Tarina Belue and appellant met in 2013 and were married in 2014. Their relationship was characterized by copious alcohol and drug use by both individuals. Belue had to stop drinking at one point, and, as a result of her sobriety, she and appellant began arguing more because appellant did not want to quit drinking, contributing to repeat relapses by Belue.

Appellant and Belue moved to Santa Fe, Texas, in 2016 and lived in a trailer behind Kathy Anthony and her family. The marriage between appellant and Belue continued to deteriorate and appellant began sleeping in a front bedroom or on the couch. Appellant moved out of the trailer in early 2018 but moved back in after three weeks, when he was hurt on the job and was no longer able to work. After this injury, appellant was at home most of the time and slept in the front bedroom of the trailer. To rekindle the marriage, appellant decided to get some methamphetamine and spend time with Belue in Galveston. Soon after, appellant and Belue began using methamphetamine almost daily. Initially, appellant had money to purchase the methamphetamine, but this soon ran out and he was forced to rely on Belue to make money and purchase the drugs.

2

*Appellant's Behavior Before the Incidents*

Because appellant had a history of destroying the house while looking for methamphetamine, Belue began keeping the methamphetamine on her person. Appellant was supposed to move out of the trailer after receiving worker's compensation on July 27, 2018, but he did not receive the check on that date.

A few days before the commission of the charged offenses, appellant knocked on Kathy Anthony's door and asked her questions about the Bible. Anthony thought this strange because they lived across from a church, and she told appellant to seek answers to his questions from the pastor. Later, appellant returned to Anthony's residence and asked for a ride to the doctor for an appointment. Anthony had her daughter, Melissa Burns, take appellant to his doctor's appointment. While Burns transported appellant, he spoke to her about being an angel and "busting seals." Burns was not sure if this was his normal behavior or not because she had not spoken to appellant before. As the ride progressed, Burns stated that "he just continued to act even more crazy." When they reached appellant's doctor, appellant asked Burns if she wanted to watch him "go spill some blood," to which Burns replied, "No, that's okay. I'm all right." Appellant then got out of Burns' vehicle and went to the doctor's office.

Appellant returned shortly thereafter, got back into Burns's car, and began writing down something from his Bible. He again left Burns's vehicle and returned

3

to the doctor's office three or four more times. On one of these trips, appellant used Burns's cell phone to call Belue and talk with her. When appellant again returned to the doctor's office, Burns called Anthony and told her what was going on. Anthony told Burns to leave appellant there, so Burns left.

The following day, July 28, 2018, appellant went to Anthony's residence and knocked on the door. Burns, who answered the door, said that "[h]e was acting strange, real sweaty, and he asked where the closest big area of water was." Burns referred appellant to Galveston Beach, and told him to get off her porch because he was making her nervous. Appellant left but again returned to Anthony's residence. Burns retrieved her baseball bat and met appellant on the front porch, where she told him that her kids were in the house and that he was scaring her mother. She then told appellant to go away and not to come back.

*Appellant's Assault of Belue*

On the morning of July 30, 2018, Belue had not taken any methamphetamine while getting ready for work. She had methamphetamine on her person, set some of it on the coffee table, and said, "There it is," before returning to her bedroom to get ready for work. Belue heard some glass break in the kitchen and found that appellant had set fire to some decorative straw in a vase. This was the third incident of appellant setting a fire in the house. Appellant appeared to be on his way out of the

4

house but stopped and helped Belue put out the fire. Belue nervously returned to her room because she was afraid appellant might hurt her and her dog.

Appellant entered Belue's room with a machete originally belonging to Burns, which Burns had left stuck in a tree on her property. Belue was not scared because she did not think appellant would use the machete on her. Appellant stood at the entrance of the room staring at Belue, and Belue said, "If you're going [to] use it, you know, make sure you don't let me live away from it." Appellant then came to the foot of the bed and stated, "I got to do this." Belue asked what he was talking about and began trying to leave the bedroom, but appellant prevented her from doing so. It took Belue ten minutes to retreat to the kitchen from her bedroom, as she tried to diffuse the situation. Belue reached her cellphone and tried to call her aunt to ask her to call 9-1-1, but she was unable to reach her aunt. Belue was afraid to call for help herself.

Belue decided to go outside to escape appellant, but she was afraid she could not make it out of the trailer without being hit by appellant. Belue made it outside twenty minutes later and began running toward an open gate, hoping to get to Anthony's house. After making it through the gate, Belue turned to see if appellant had followed her and he then swung the machete at her. The first blow hit her in the back of her neck and knocked her unconscious briefly. On regaining consciousness, Belue saw appellant was staring at her, and "he started swinging again and again and

5

again." Appellant tried to decapitate Belue with the machete. As appellant struck Belue, he "had a cold stare and looked content." Appellant continued to hit Belue until she again lost consciousness.

During the events, Anthony was outside her residence with her grandchildren, and Burns was inside the residence with her girlfriend. Thomas Houston was visiting Anthony outside her house, and both Houston and Anthony heard arguing and loud noises from Belue's residence. Shortly after, Anthony and Houston heard Belue say, "Oh, my God! He's killing me! He's killing me!" Belue yelled at appellant to stop, and Anthony and Houston then heard something hit the fence very hard and saw Appellant wielding a machete. After walking over to the fence, Anthony and Houston saw appellant swinging the machete at Belue, who was on the ground. Anthony saw appellant holding Belue's hair in one hand and swinging the machete with the other hand, striking Belue in the neck. Houston saw appellant holding a Bible in one hand and a swinging machete in the other hand. Houston saw appellant strike Belue on her back, upper torso, and neck. Anthony and Houston beseeched appellant to stop and told him it was wrong, but appellant reportedly replied, "No. It says right here in the Bible that I've got to do this." Appellant was firm in his conviction that he had to kill Belue.

Houston told Anthony that they needed to go inside, but Anthony refused until she was reminded that her grandchildren were still outside. Houston told Anthony

to call 9-1-1, and Anthony complied. Houston again asked appellant to stop attacking Belue, but appellant continued hitting Belue with the machete. Soon after, Houston heard "a loud, hollow thump, and everything went silent." Belue had stopped screaming, and Houston told Anthony to tell the police to hurry because it might be too late.

*Appellant's Assault of Others*

Anthony ran to the other side of the fence and told appellant to stop. Appellant stopped and told Anthony that God told him he had to kill Belue because she was Satan. Appellant then began walking to the gate and told Houston that he needed to come into Anthony's backyard and take care of some things. Appellant followed Anthony as she moved to her back porch. Appellant held a Bible, and he was saying things from the Bible. Anthony told appellant to get away from her, and appellant told her he had to kill the demons, referring to Anthony's granddaughters. Anthony then brought her granddaughters into the residence and got Burns.

Burns was sleeping and awoke to her mother saying, "Melissa he's going to kill her! He's going to kill her!" Burns saw her terrified mother, got a baseball bat, and went outside to confront appellant. Burns saw appellant standing face-to-face with Houston and noticed that he had a machete in his hand. Burns recognized the machete as belonging to her. Appellant told Houston about some scripture in the

7

Bible that he wanted Houston to read, and Houston replied "No, I don't need to read nothing."

Burns told appellant he needed to leave, angering him. As Burns walked toward appellant, he began to move toward Burns. When he was two feet away from Burns, appellant raised the machete and swung at Burns. Houston then stepped in front of Burns, so the swing of the machete was directed toward him instead. At this time the police arrived, and the sound of the sirens prompted appellant to run away while still holding the machete.

*Appellant's Arrest*

Officer B. Klondaris was called to the scene and, on arrival, he saw appellant carrying a machete and a Bible. Appellant was also "talking and saying things that did not make any sense." Klondaris got out of his car, drew his weapon, and ordered appellant to drop the machete, but appellant did not comply. Appellant continued holding the machete and started to walk down a nearby alley, holding the machete above his head. Another officer, B. Bernard, arrived and both officers drew their tasers while repeatedly telling appellant to drop the machete. Appellant again did not comply and took a couple steps away from the officers. Both officers then deployed the tasers into appellant's back. Appellant dropped the machete and Bible, but still took a few more steps before falling to the ground. Officers had to physically fight appellant to subdue and handcuff him.

As the officers took appellant to Bernard's car, appellant screamed about the children and how they were demons that he had to kill. Appellant did not comply with anything officers tried to get him to do, but he remained conscious. When officers put appellant in the backseat of the car, he began kicking at the windows and officers were forced to clamp appellant's feet down so he could not move. Officers also had to tase appellant several more times to subdue him.

Bernard thought appellant was under the influence of some narcotic, and he called emergency medical personnel to check on his condition. Bernard believed that appellant was under the influence of methamphetamine and wanted to make sure appellant was not suffering from "excited delirium." Medical personnel determined appellant was not suffering from "excited delirium" and said that he could be transported to the police station. Appellant was no longer combative as he was transported to jail, but he yelled that "she's the anti-Christ and he had to sever the head of the anti-Christ." On arrival at the police station, officers were able to keep appellant calm by reading Bible verses to him.

*Belue's Injuries*

Officer Klondaris found Belue on the ground near the fence in "bad" condition. Belue had a large laceration across the right side of her neck and Klondaris stated, "You could actually see her neck swelling from the internal bleeding, because there's no external bleeding from that." Belue also had multiple lacerations to her

9

back and one of her fingers had been severed. Klondaris did not believe that Belue was going to survive.

Belue was semi-conscious at the time and responsive, but breathing very heavily. After her arrival to the hospital, Belue was able to breathe and speak. Her condition was critical, and her mental status was altered. "She wasn't really communicative a hundred percent; she could answer questions, but it wasn't really having a conversation. She was in and out of consciousness." On examination, medical personnel determined that several of Belue's vertebrae were broken, and her blood flow was blocked after an injury to a vertebral artery, which was considered severely life-threatening. One of Belue's fingers had been amputated and one of the muscles in her neck was cut. It took three months for Belue to move again without a walker.

After a search warrant was obtained, officers entered Belue's residence and found the broken vase, in which appellant had set the fire, along with narcotics paraphernalia, including methamphetamine pipes and a marihuana pipe. Officers also found a scale used to weigh illegal narcotics and 1.23 grams of methamphetamine.

*Trial*

Before trial, appellant's trial attorney acknowledged that the affirmative defense of insanity was not being raised by the defense. During final argument to

10

the jury, the trial prosecutor noted that neither insanity nor involuntary intoxication were in the trial court's charge to the jury and, thus, were not issues for the jury to consider.

During his testimony at the punishment hearing, appellant acknowledged that any of his mental issues were due to drug and alcohol abuse. There was no evidence that appellant had ever suffered from a severe mental disease or defect. Additionally, there was no evidence that, at the time of the commission of the charged offenses, appellant did not know his conduct was wrong. In fact, evidence shows that appellant stopped his attacks when he heard sirens signaling the arrival of the police and he ran away at that time. Officer Bernard testified that appellant was obviously under the influence of some narcotic, probably methamphetamine. Appellant was a chronic abuser of methamphetamine and had taken methamphetamine again on the morning of the offense.

The State charged appellant with committing the felony offenses of aggravated assault of a family member and aggravated assault. Appellant entered pleas of not guilty to the charged offenses. The jury found appellant guilty as charged in the indictment and assessed his punishment at 50 years in prison for the first offense and 10 years in prison for the second offense. Appellant appeals from these verdicts.

## DUTY TO SUA SPONTE ORDER PSYCHIATRIC REVIEW FOR INSANITY

In his sole issue, appellant argues that the trial court erred in failing to sua sponte order a psychiatric review, given evidence of appellant's insanity at the time of the offense. He asserts that applicable law should be changed because due process calls for having a safeguard in place with respect to the insanity defense, and the trial court should have instructed the jury on an insanity charge.

*Standard of Review*

Appellant acknowledges that current law does not require a trial court to sua sponte order a psychiatric review when evidence of insanity during commission of the offense is raised during trial. Appellant also acknowledges that "he is seeking a change in the law." He analogizes insanity evidence during an offense that is presented at trial to competency issues presenting at trial, which call for an informal competency inquiry "upon a 'suggestion' from any credible source that the defendant may be incompetent." *See* TEX. CODE CRIM. PROC. art. 46B.004; *Boyette v. State*, 545 S.W.3d 556, 563 (Tex. Crim. App. 2018). There being no current requirement for a trial court to sua sponte order a psychiatric review, there has been no corresponding standard of review applied. Thus, using appellant's analogy to the law of competency, we will determine whether the trial court abused its discretion in failing to sua sponte require an insanity inquiry. *See Montoya v. State*, 291 S.W.3d

12

420, 426 (Tex. Crim. App. 2009) (applying "abuse-of-discretion" standard in reviewing trial court's failure to sua sponte order competency inquiry).

*Law on Insanity*

It is an affirmative defense to prosecution that, at the time of the conduct charged, the defendant, as a result of severe mental disease or defect, did not know that his conduct was wrong. TEX. PENAL CODE § 8.01(a). If a defendant knows that his conduct is "illegal," then he understands that his conduct is "wrong," even if, due to a mental disease or defect, he believes that his conduct is justified. *See Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008).

However, to raise an insanity defense at trial, a defendant must comply with article 46C.051 of the Texas Code of Criminal Procedure by filing, at least 20 days before the case is set for trial, a notice of his intent to offer evidence of insanity, which contains a certification that a copy of the notice has been served on the attorney representing the state. TEX. CODE CRIM. PROC. art. 46C.051. If the trial court fails to timely give such notice, he may attempt to show "that good cause exists for [his] failure to give notice," *see id*. art. 46C.052, but existing law does not impose a duty on the trial court to sua sponte raise the issue of insanity for a defendant. The trial court may, however, sua sponte appoint an expert *if* a defendant has filed a notice of his intention to raise an insanity defense. *See id.* art. 46C.101.

The trial court is required to instruct the jury on statutory defenses, affirmative defenses, and justifications when they are raised by the evidence and requested by the defendant. *See Walters v. State,* 247 S.W.3d 204, 208-09 (Tex. Crim. App. 2007); *see also Posey v. State,* 966 S.W.2d 57, 63 (Tex. Crim. App. 1998) (holding that a trial court has no duty to sua sponte instruct jury on unrequested defensive issues). The law does not impose on a trial court a duty to sua sponte instruct a jury on defensive issues. *See Tolbert v. State,* 306 S.W.3d 776, 779–80 (Tex. Crim. App. 2010).

*Analysis*

Appellant acknowledges that existing Texas law imposes no duty on a trial court to sua sponte raise the issue of insanity but argues nonetheless that he is "seeking a change in the law." There is good reason for not departing from the existing law, however, because defensive issues, such as insanity, involve strategic decisions best left to the defendant and his counsel. *See Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007); *Posey*, 966 S.W.2d at 62-63 (holding no duty on trial court to sua sponte instruct jury on unrequested defensive issues, even defensive issues raised by evidence at trial.)

Recognizing that defensive issues involve strategic decisions best addressed by appellant and his counsel, the only court to directly address in a published opinion the issue raised by appellant in this case held that "[a] criminal defendant who desires

14

to raise the insanity defense does so by following the guidelines set forth in chapter 46C of the Texas Code of Criminal Procedure." *Hill v. State*, 320 S.W.3d 901, 903–4 (Tex. App.—Amarillo 2010, pet. ref'd); *see also Wagner v. State*, 687 S.W.2d 303, 306, 312 (Tex. Crim. App. 1984) (holding trial court did not err by refusing to admit evidence of insanity at trial when defendant failed to comply with statute requiring notice of intent to present insanity defense). In so holding, the *Hill* court rejected the argument that the trial court had a duty to sua sponte raise the issue of the defendant's insanity, stating:

> As to appellant's contention that the trial court should have *sua sponte* stopped the punishment hearing upon receiving evidence of appellant's mental health issues, appellant has presented no authority for that proposition. Although appellant likens that procedure to the procedure adopted for determining the competency of an individual to stand trial, such comparison is without any authority. In fact, in ruling on the issue of the trial court's duty to *sua sponte* order an examination for purposes of an insanity defense under the previous statute, our sister court has held that, since no notice was filed, there was no issue of insanity before the trial court and the trial court had no duty to *sua sponte* order any type of psychiatric examination. *See Gomez v. State,* Nos. 14–99–00465–CR & 14–99–00466–CR, 2001 WL 306275, at *3–4, 2001 Tex. App. LEXIS 2094, at *9–*12 (Tex. App.—Houston [14th Dist.] Mar. 29, 2001, pet. ref'd) (not designated for publication). We agree with the *Gomez* court, and hold that the trial court has no duty to *sua sponte* stop the punishment hearing to order a psychiatric examination for purposes of an insanity defense when no timely notice of intent to pursue such a defense has been given. Accordingly, appellant's issue as to the *sua sponte* duty of the trial court is overruled.

*Hill*, 320 S.W.3d at 904 (footnote omitted).

We agree with the *Hill* court (and the unpublished *Gomez* case cited therein), that to raise the issue of insanity, a defendant must first comply with the procedures set forth in chapter 46C of the Texas Code of Criminal Procedure.[1] To impose a duty on the trial court to raise the issue of insanity when evidence that *might* support the affirmative defense is introduced at trial is inconsistent with the statutory scheme set up in chapter 46C.[2] Appellant's invitation for this Court to *create* a "mechanism for a trial court to initiate an inquiry into a defendant's sanity, or lack thereof, at the time an offense was committed," is a task best left to the legislature, should it choose to do so.

Because there is no law requiring the trial court to sua sponte order a psychiatric review when evidence that might raise an insanity defense is presented at trial, the trial court did not abuse its discretion in failing to do so.

---

[1] *See* TEX. CODE CRIM. PROC. arts. 46C.001-46C.270.

[2] Appellant does not challenge the facial constitutionality of the procedures set up in Chapter 46C of the Texas Code of Criminal Procedure, and, even if he did, such a challenge cannot be raised for the first time on appeal. *See Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009) "[A] defendant may not raise for the first time on appeal a facial challenge to the constitutionality of a statute").

16

## CONCLUSION

We affirm the trial court's judgments.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Hightower and Adams.

Do not publish. TEX. R. APP. P. 47.2(b).