

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00154-CR

Esteban **SAN MIGUEL**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 81st Judicial District Court, Wilson County, Texas
Trial Court No. CRW2107146
Honorable Jennifer Dillingham, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:    Irene Rios, Justice
Lori Massey Brissette, Justice
H. Todd McCray, Justice

Delivered and Filed: August 27, 2025

AFFIRM

Appellant Esteban San Miguel appeals his convictions for the sexual assault of a child and the aggravated sexual assault of a child. In four issues, San Miguel challenges the sufficiency of the evidence supporting his convictions, the trial court's denial of his motion for mistrial for jury misconduct, the trial court's evidentiary ruling admitting a recording into evidence, and the deprivation of due process when the jury verdict was allegedly leaked prior to its announcement in court. We affirm.

## BACKGROUND

In two counts, a grand jury indicted San Miguel for the sexual assault of a child and for the continuous sexual assault of a child, which also included the allegations of aggravated sexual assault of a child and indecency with a child by contact, both lesser included offenses of the continuous sexual assault of a child. *See* TEX. PENAL CODE ANN. §§ 21.02(b)(1), (2)(A), 21.11, 22.011(a)(2), 22.021(a)(2)(B). San Miguel was charged with committing these offenses against A.C.,[1] the daughter of T.C. who San Miguel shared a romantic relationship with for several years.

Multiple witnesses testified at trial. However, A.C., T.C., a physician, and San Miguel provided the relevant testimony to this appeal. The jury found San Miguel guilty of committing sexual assault of a child and aggravated sexual assault of a child, the lesser included offense of the continuous sexual assault of a child for which San Miguel was found not guilty. *See id.* §§ 21.02(b)(1), (2)(A), 22.011(a)(2), 22.021(a)(2)(B). The trial court followed the jury's recommendations and sentenced San Miguel to twenty years in prison for committing sexual assault of a child and ninety years in prison for committing aggravated sexual assault of a child, to run concurrently. San Migual timely filed a motion and an amended motion for new trial that was overruled by operation of law. This appeal ensued.

## SUFFICIENCY OF THE EVIDENCE

In his fourth issue, San Miguel challenges the sufficiency of the evidence supporting the convictions for sexual assault of a child and aggravated sexual assault of a child. Because determining the sufficiency of the evidence to support a conviction is a rendition point, we address San Miguel's sufficiency challenge first.

---

[1] Because the complaining witness was a minor at the time the offenses were committed, we use pseudonyms or initials rather than the names for both the complainant and other family members to protect the minor's privacy. *See* TEX. R. APP. P. 9.10(a)(3).

*A. Standard of Review*

When reviewing the sufficiency of the evidence, we determine whether, "'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Witcher v. State*, 638 S.W.3d 707, 709–10 (Tex. Crim. App. 2022) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

This standard coincides with the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. The factfinder may and should draw "reasonable inferences" from the evidence but may not draw conclusions based on "mere speculation." *Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007).

The factfinder alone judges the credibility of the witnesses and the weight of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). We may not reevaluate the evidence's weight and credibility of the witnesses and substitute our judgment for that of the factfinder. *Braughton*, 569 S.W.3d at 608. Instead, we determine whether the necessary inferences are reasonable based on the cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Id*. We must presume the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Id*.; *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (reviewing court must not usurp the jury's role by "substituting its own judgment for that of the jury"). "Although the parties may disagree about the logical inferences that flow from undisputed facts, where there are two permissible views of the evidence, the [factfinder's] choice between them

cannot be clearly erroneous." *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (internal quotation marks omitted).

### B. Applicable Law

Under the penal code, a person commits sexual assault of a child—a person younger than seventeen years old—if he "causes the penetration of the anus or sexual organ of a child by any means[.]" TEX. PENAL CODE ANN. § 22.011(a)(2)(A), (c)(1). Count one of the indictment alleges San Miguel "intentionally and knowingly cause[d] the penetration" of A.C.'s female sexual organ by his sexual organ, while A.C. was under the age of seventeen.

A person commits the offense of aggravated sexual assault of a child if he intentionally or knowingly "causes the penetration of the anus or sexual organ of a child by any means" and the child is younger than fourteen years old. *Id.* § 22.021(a)(1)(B)(i), (2)(B). Here, count two of the indictment alleges San Miguel committed the continuous sexual assault of a child when he committed multiple acts constituting aggravated sexual assault while A.C. was less than fourteen years old. Pursuant to the jury charge, if the jury found San Miguel not guilty of the continuous sexual assault of a child, the jury was charged with determining whether San Miguel committed the lesser included offense of aggravated sexual assault of A.C. by intentionally or knowingly causing the penetration of A.C.'s sexual organ by San Miguel's sexual organ at the time A.C. was less than fourteen years old.

### C. Relevant Facts

A.C. was born September 27, 2001. T.C. and her ex-husband adopted A.C., and her four siblings, when A.C. was five years old. After T.C. and San Miguel's dating relationship developed, San Miguel moved into T.C.'s house with her and her nine children. A.C. testified she was about ten years old when T.C. began dating San Miguel.

A.C. testified that originally, San Miguel worked near Houston and would come to A.C.'s house on the weekend. Then, San Miguel started working overseas where he would be gone for three months then return for six weeks. When he came home, he would either stay at A.C.'s house or in Camp Wood with his parents. A.C. stated that San Miguel would take her and her siblings to water parks and engage in family activities. A.C. testified she and San Miguel had a father/daughter relationship. A.C. described that she and San Miguel shared "cuddle time," where they would lie in bed together clothed but under the sheets in either a spooning position or A.C. would lay her head on San Miguel's chest while watching television and talking. At that time, A.C. thought everything was normal.

However, everything changed the night before her sister's wedding. Her sister wed on October 10, 2014, a few weeks after A.C. turned thirteen years old. A.C.'s aunt stayed at her house and slept with her mom in the master bedroom, and San Miguel slept in the dayroom. The night before the wedding, A.C. went to the dayroom with San Miguel for what she thought would be their normal cuddle time, however, San Miguel digitally penetrated A.C., had her stroke and massage his sexual organ, perform oral sex on him, and engage in sexual intercourse with him. This was the first time she had ever had a sexual experience. A.C. stated San Miguel put his hand over her mouth because she was making noise. San Miguel also ejaculated in A.C.'s mouth. As A.C. was leaving the room, San Miguel thanked her and told her he needed that. A.C. explained that she returned to her bedroom and pretended nothing had happened, and she did not tell her mom or anyone about it because she was "in shock."

A.C. testified about another incident that occurred in the laundry room during a family barbecue. While everyone was outside, A.C. and San Miguel went inside to the laundry room where San Miguel had sexual intercourse with A.C. A.C. specifically recalled this occurrence

because San Miguel "had [her] get on all fours, [on her] knees and hands" to avoid people seeing them through a window. A.C. also recalled performing oral sex on San Miguel when they would go to the grocery store alone and having sexual intercourse in the backseat of his truck one time when San Miguel stopped at a house for sale. A.C. testified that San Miguel also had sexual intercourse with her at times when they were at his ranch in Camp Wood. A.C. explained that San Miguel used code words to indicate to her he wanted to have sex. A.C. testified San Miguel continuously engaged in sexual intercourse and other sexual acts with her until she turned sixteen.

A.C. stated she did not tell anyone about the sexual abuse because she was still in shock and felt partially at fault. A.C. finally told her mom when she was sixteen and a junior in high school, explaining she did so because T.C. was no longer with San Miguel, and A.C. knew she would never see him again. A.C. claimed her mother did not call the police at that time because T.C. wanted A.C. "to be able to process it and for [A.C.'s] siblings to be a bit older."

A.C. was at Air Force boot camp when T.C. reported the sexual abuse to law enforcement. A.C. learned T.C. reported the sexual abuse when A.C. was contacted by law enforcement during boot camp. A.C. added that she did not want the police involved and did not make the decision to finally report the sexual abuse.

T.C. stated that she did not report the abuse when A.C. first told her but confronted San Miguel with the allegations within days of A.C. telling her. T.C. claimed that San Miguel initially contended no one would believe the allegations and that she could not prove them. He also contended he was a professional with a stellar reputation and had the money to hire a lawyer to fight any allegations. After a failed attempt to get San Miguel to admit what happened between him and A.C., T.C. successfully recorded a phone conversation with San Miguel, wherein he discussed the allegations and admitted to having a sexual relationship with A.C. The recorded call

was admitted into evidence and played for the jury. Because of what happened, T.C. stated that her relationship with A.C. became fragmented, and they no longer speak.

During cross-examination, T.C. acknowledged that right after her adopted children were taken into custody by child protective services and placed into foster care with T.C. and her ex-husband, the oldest child "made a false allegation [that T.C.'s ex-husband exposed himself to her] in an attempt to control the direction of the sibling group" and keep her siblings together, but the allegation was "proven false very quickly." T.C. also agreed that San Miguel bought a car for A.C., and T.C. later insisted San Miguel transfer the car title to A.C. because of what he had done to A.C. T.C. denied threatening San Miguel that she would report what he had done or demand money from him if he did not transfer the car title.

During the recorded phone call, San Miguel initiated the discussion about A.C. and admitted to having sexual intercourse with her. He also admitted that A.C. performed oral sex on him. San Miguel confirmed many of the details A.C. provided in her testimony, including the first time they had sexual intercourse in the dayroom, A.C. performing oral sex on him, and having sex with San Miguel in his truck. While San Miguel acknowledged his responsibility, he stated that A.C. "pours out sex" and if not for A.C., who pushed him even though he tried to fight it, he would not have done anything with her. San Miguel added that he even vomited after the first time they had sex. As to how it began, San Miguel said A.C. began coming to him in the middle of the night because she wanted him to "masturbate her" and that she would lay beside him positioning her behind up against him. San Miguel claimed A.C. told him it was no big deal for them to have sex. He also claimed A.C. was a sex addict. Several times, San Miguel told T.C. during the call that he had no reason to lie to her and that he was afraid T.C. was going to call his parents, and the news would kill his mother. San Miguel said his actions were shameful and explained it happened

because he failed as a "Christian man." San Miguel began crying after speaking with T.C. for about an hour.

The State also called child abuse pediatrician Dr. Natalie Nikeisha Kissoon to testify. Although Dr. Kissoon had no interaction with A.C., she testified that delayed outcries are common, and it typically takes a child approximately two to three years to disclose sexual abuse, but sometimes longer depending on the child.

San Miguel testified in his own defense. San Miguel did not recall when T.C. initially contacted him regarding the allegations but stated he denied them. Nonetheless, San Miguel claimed he and T.C. maintained a relationship, and he stayed with T.C. for more than a year after the allegations were made. San Miguel testified he began thinking T.C. dated him only for the financial benefits she received from him because he was earning approximately $600,000 annually working overseas. San Miguel described his break-up with T.C. as peaceful. But soon after, San Miguel claimed T.C. called him about A.C.'s allegations again and threatened to report it to the police if he did not help her financially. Specifically, San Miguel testified T.C. told him he owed A.C. "for what [he] did to her[,]" demanding he sign the title of the car over and, while referring to the Bible, demanded $80,000 cash from him. San Miguel claimed T.C. repeatedly contacted his parents and sisters claiming that he was a pedophile, a rapist, and would soon be going to jail. San Miguel explained before his arrest, T.C. called him repeatedly asking him to discuss the allegations while continuing to attempt to extort money from him. San Miguel claimed he refused to pay T.C. money and told her to take him to court because he believes that if a person is telling the truth he should have nothing to worry about.

With respect to the recorded call, San Miguel maintained that after continuous conversations with T.C. and believing she would not stop until he told her what she wanted to hear,

he told her about a sexual relationship with A.C. According to San Miguel, he was persuaded to tell T.C. what she wanted to hear because T.C. reminded him that it had been a year and a half since the allegations, and she had "not taken [him] to jail." However, during cross-examination, San Miguel did not provide an answer as to why a man of his intelligence and fiscal savvy, who claimed T.C. was attempting to extort money from him, would admit to sexually assaulting T.C.'s minor child to appease T.C. and end the extortion. He claimed he provided the level of detail because he "knew everything that [T.C.] wanted to hear" and believed T.C.'s promise to not report the sexual abuse allegations. San Miguel claimed that while he knew phone calls could be recorded, he did not know Texas permitted a one-party consent to record rather than both parties having to consent to being recorded. San Miguel testified that during the recorded call, the reason he placed blame on A.C. was because A.C. had "[a] huge problem" with being sexually promiscuous, and T.C. refused to believe it.

In attempts to explain some of the allegations, San Miguel testified that "cuddle time" involved all the children, happened in the master bedroom with the door open, and T.C. was always present. When T.C.'s sister visited to attend a family wedding, San Miguel claimed he slept in the dayroom because T.C. felt it looked more appropriate to sleep separately because they were not married. Also, San Miguel stated A.C.'s allegations of the frequency of his sexual assaults were not possible because he had erectile dysfunction due to his diabetes. Additionally, San Miguel explained that A.C.'s allegations were false because, like A.C.'s sister's allegations against her father, both A.C. and her sister used the same key phrase when explaining how they were told to perform oral sex, to "suck it like a lollipop."

*D. Analysis*

In his brief, San Miguel argues the evidence is insufficient to support his convictions because "[t]he [j]ury misconduct coupled with singular, out-of-court, and incomplete [] recording rendered the jury verdict speculative." San Miguel further argues that these points establish the trial court committed harmful and reversible error. While we question whether San Miguel was attempting to make a cumulative error complaint or challenging the sufficiency of the evidence supporting his convictions, we address each of San Miguel's other appellate issues below and determine the trial court either did not err or that San Miguel failed to preserve an issue, resulting in no cumulative error. To the extent San Miguel is challenging the sufficiency of the evidence to support his convictions, we address this issue first.

A.C. provided detailed evidence regarding multiple instances in which San Miguel had sexual intercourse with her. A.C. specifically recalled the first time San Miguel had sex with her as it occurred on the night before her sister's wedding, October 10, 2014, when A.C. was thirteen years old. Additionally, A.C. testified that San Miguel had sexual intercourse with her during a family picnic at her house in the laundry room and in the back seat of his truck in front of a house that was for sale. A.C. stated that San Miguel frequently requested to have sexual intercourse with her at various locations and times throughout the years while San Miguel maintained a romantic relationship with T.C. A.C. was less than seventeen years old during the entire time San Miguel sexually abused her.

After A.C. informed T.C. of the sexual abuse, T.C. recorded a phone call between T.C. and San Miguel. During the call, San Miguel admitted having sexual intercourse with A.C. and provided several details that matched A.C.'s testimony, including the first sexual assault being in the dayroom and having sex in his truck. Despite San Miguel's testimony denying any sexual

conduct with A.C. and testifying he was not being truthful in the recording but only saying what T.C. wanted to hear to appease her, the jury, as factfinder, determines witness credibility and resolves conflicts in the testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Braughton*, 569 S.W.3d at 608.

Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *See Witcher*, 638 S.W.3d at 709–10; *see also Jackson*, 443 U.S. at 319. The evidence is sufficient to support San Miguel's sexual assault of a child and aggravated sexual assault of a child convictions.

Accordingly, we overrule San Miguel's sufficiency issue, his fourth issue as presented in his brief.

### MOTION FOR MISTRIAL

Based on jury misconduct, San Miguel contends the trial court erred when it denied his request for a mistrial.

In particular, prior to the jury charge being read and the parties' closing arguments during the sentencing phase of San Miguel's trial, San Miguel notified the trial court that a member of his family saw a man associated with the complainant talking with a juror and shaking the juror's hand. In response and with counsel present, the trial court held an in-chambers conference to conduct an individual inquiry of San Miguel's family member who witnessed the exchange, the man who spoke to the juror, the presiding juror, and the remaining jurors. According to the presiding juror, it was a brief encounter wherein the man shook his hand and told him, "Thank y'all for your service[,]" to which the juror responded, "My man." According to the trial court's questioning of the other jurors, none of them were approached and none of them witnessed the exchange. However, some of the jurors reported that the presiding juror told them about the

exchange once the jurors were assembled again. The jurors who heard the presiding juror's account of the encounter testified that the man's statement thanking the juror would not influence their ability to deliberate as a juror. Some of the jurors reported that the presiding juror's demeanor was opposite of being appreciative of the man thanking him; but rather the presiding juror appeared displeased with the encounter because he took his oath seriously.

### A. Standard of Review

We review the denial of a motion for mistrial under an abuse of discretion standard and must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010); *see also Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024) ("We review a trial court's denial of a motion for a mistrial . . . under an abuse of discretion standard."). Under this standard, we do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable. *Becerra*, 685 S.W.3d at 127. A trial court abuses its discretion when no reasonable view of the record could support its ruling. *Id*.

A mistrial is the remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (quotation omitted). A mistrial is required only when an impropriety is "clearly prejudicial to the defendant" and is "of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Perez v. State*, 695 S.W.3d 843, 851 (Tex. App.—Houston [1st Dist.] 2024, pet. ref'd) (quotation omitted); *see also Young v. State*, 283 S.W.3d 854, 878 (Tex. Crim. App. 2009).

*B. Applicable Law*

Article 36.22 of the Texas Code of Criminal Procedure provides:

No person shall be permitted to be with a jury while it is deliberating. No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court.

TEX. CODE CRIM. PROC. ANN. art. 36.22. "The primary goal of [a]rticle 36.22 is to insulate jurors from outside influence." *Ocon v. State*, 284 S.W.3d 880, 884 ((Tex. Crim. App. 2009).

Recently, the Texas Court of Criminal Appeals disavowed applying a rebuttable presumption of harm to violations of article 36.22 and held that "the appropriate standard for evaluating harm" when considering a "violation of [a]rticle 36.22 is the standard for non-constitutional error found in [r]ule 44.2(b)." *Becerra*, 685 S.W.3d at 141; *see also* TEX. CODE CRIM. PROC. ANN. art. 36.22; TEX. R. APP. P. 44.2(b).

Pursuant to rule 44.2(b), any non-constitutional error that does not affect substantial rights must be disregarded. *See* TEX. R. APP. P. 44.2(b). "An error affects substantial rights only if it has a substantial or injurious effect in determining the jury's verdict." *Becerra*, 685 S.W.3d at 144. "If, on the other hand, after an examination of the record as a whole we have a fair assurance that the error did not influence the jury, or had but a slight effect, a reviewing court should not overturn the conviction." *Id.*

*C. Analysis*

The State concedes that the man thanking the juror for the jury's service violated article 36.22. Nonetheless, the State argues the error is harmless after applying the rule 44.2(b) harm analysis as required by *Becerra*. *See id*. at 141. Assuming without deciding the encounter violated article 36.22, we agree with the State that the violation, if any, was harmless.

First and foremost, there is no indication that the jury was influenced by the violation even given the opportunity to express a problem to the trial court directly when each juror was separately questioned in the trial court's chambers. Importantly, some of the jurors did not even know about the encounter, and those who did expressly agreed that the man's comment to the presiding juror would not influence their ability to engage in jury deliberations. With respect to the presiding juror, he not only claimed the encounter would not influence his decisions during jury deliberations, but he also expressed displeasure with the encounter because he took the jury instructions seriously.

Moreover, A.C.'s testimony about the sexual assaults and aggravated sexual assault as well as the recorded call wherein San Miguel admits to committing the assaults and corroborates many of the details given by A.C., provide overwhelming evidence supporting San Miguel's convictions.

Therefore, after evaluating whether the article 36.22 violation harmed San Miguel, we conclude this non-constitutional error did not affect San Miguel's substantial rights. *See* TEX. R. APP. P. 44.2(b); *see also Becerra,* 685 S.W.3d at 141, 144.

We overrule San Miguel's first issue concerning jury misconduct.

### EVIDENTIARY RULING

Relying on rule 107 of the Texas Rules of Evidence, San Miguel argues in his evidentiary appellate issue that the trial court erred by admitting the recording of only one phone call out of a series of phone calls between T.C. and San Miguel regarding A.C.'s sexual abuse allegations. *See* TEX. R. EVID. 107. Rule 107, the rule of optional completeness, provides:

> If a party introduces part of an act, declaration, conversation, writing, or recorded statement, an adverse party may inquire into any other part on the same subject. An adverse party may also introduce any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent . . . .

*Id.*

To preserve a complaint for appellate review, the complaining party must present a timely request, objection, or motion to the trial court which states the specific grounds for the desired ruling unless the specific grounds are apparent from the context. *See* TEX. R. APP. P. 33.1(a)(1)(A); *see also Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014). "Failure to preserve error at trial forfeits the later assertion of that error on appeal." *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) (citation omitted). All error, including complaints about the admissibility of evidence, may be forfeited if the appellant fails to object during trial. *See id.* (citing *Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002)).

After reviewing the appellate record, we conclude San Miguel failed to make a timely and specific objection or request to admit other recordings into evidence based on optional completeness. *See* TEX. R. APP. P. 33.1(a)(1)(A); TEX. R. EVID. 107. In fact, while San Miguel contended at trial that he and T.C. talked on the phone several times about A.C.'s sexual abuse allegations, a fact T.C. did not contest, no evidence was presented that indicated more than one phone call was recorded. At no time did San Miguel even contend he had copies of other recordings to consider admitting into evidence. San Miguel failed to preserve his evidentiary issue, and thus it is waived. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Yazdchi*, 428 S.W.3d at 844; *Fuller*, 253 S.W.3d at 232.

Nevertheless, San Miguel argues that he did timely object to the trial court's failure to admit additional recordings. However, based on the record references San Miguel provides in his brief and our review of the record on appeal, we cannot locate in the record that San Miguel brought a rule 107 optional completeness objection or requested the admission of any other recording. Rather, San Miguel's objection pertained to the use of a transcript of the recorded call to be used by the jury while the recording was played. Thus, to the extent San Miguel complains about the

trial court's overruling the objection he made regarding the use of the transcript of the recorded call, his argument on appeal—optional completeness—does not comport with his objection made at trial and thus is not preserved. *See Yazdchi*, 428 S.W.3d at 844.

We overrule San Miguel's second issue contending the trial court erred in failing to admit additional evidence based on optional completeness because the issue was not preserved. *See* Tex. R. App. P. 33.1(a)(1)(A); *see also Fuller*, 253 S.W.3d at 232.

## MOTION FOR NEW TRIAL

Last, in his third appellate issue, San Miguel contends he was deprived of due process when the jury verdict was allegedly leaked prior to its announcement in court.

Specifically, San Miguel argues that prior to the trial court's announcement of the verdict during the guilt/punishment phase of his trial, a woman allegedly discovered the jury's guilty verdict, and that San Miguel was being sentenced to thirty years in prison. This woman then placed a call to a man and informed him about the verdict and sentence. A second person who was in the first man's presence overheard the phone call between the woman and first man. This second person then text messaged a third individual telling him San Miguel was sentenced to thirty years in prison. To his amended motion for new trial, San Miguel attached several affidavits explaining what allegedly happened and a photograph of the text message. The woman who supposedly prematurely discovered the verdict and sentence did not provide an affidavit; but according to another affidavit, someone interviewed the woman, and she refused to disclose the source of the information.

Although San Miguel does not raise this appellate issue in the context of the trial court erroneously denying his motion for new trial, his complaint about jury misconduct associated with the early release of the guilty verdict and sentence is first presented in his amended motion for new

trial, not during trial. Therefore, we will address this issue from the standpoint of San Miguel contending the trial court erred in denying his motion for new trial.

### A. Standard of Review and Applicable Law

A defendant may file a motion for new trial within thirty days of the trial court imposing a defendant's sentence. *See* TEX. R. APP. P. 21.4(a). If within that same thirty-day period the trial court has not ruled on a previously filed motion for new trial, the defendant may file an amended motion for new trial without seeking leave of court. *See* TEX. R. APP. P. 21.4(b).

A trial court should generally hold a hearing if a motion for new trial and accompanying affidavits raise matters that are not determinable from the record that could entitle the accused to relief. *Rozell v. State*, 176 S.W.3d 228, 230 (Tex. Crim. App. 2005). However, "[t]he right to a hearing on a motion for new trial is not absolute," and "a reviewing court does not reach the question of whether a trial court abused its discretion in failing to hold a hearing if no request for a hearing was presented to it." *Id.*; *Gardner v. State*, 306 S.W.3d 274, 306 (Tex. Crim. App. 2009) (citing *Rozell*, 176 S.W.3d at 230).

We review the denial of a motion for new trial for an abuse of discretion. *Najar v. State*, 618 S.W.3d 366, 371 (Tex. Crim. App. 2021). "An abuse of discretion occurs only if the trial court's determination lies outside the zone of reasonable disagreement." *Barnett v. State*, 513 S.W.3d 596, 599 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007); *see also Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013) ("In the absence of express findings, as here, we presume that the trial court made all findings, express and implied, in favor

of the prevailing party," including implied finding that affidavits supporting the motion for new trial lacked credibility).

### B. Analysis

San Miguel timely filed his amended motion for new trial on March 14, 2024, and requested a hearing in the motion. The trial court signed a "Certificate of Presentment" indicating that the motion had been timely filed, and San Miguel requested a hearing on the motion or, alternatively, the grant of the motion. At the bottom of the certificate, the following was typed: "Setting for this motion can be obtained through coordinators office and set on next docket."

No hearing was conducted. However, San Miguel does not complain on appeal that the trial court failed to conduct an evidentiary hearing. Thus, we look to the evidence San Miguel provided in his motion to determine whether the trial court abused its discretion in denying his motion for new trial.

An appellant bears the burden of proving the allegation of juror misconduct. *Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000). Here, while San Miguel alleges a woman prematurely discovered his guilty verdict and sentence and then passed this information to others, San Miguel did not provide the woman's affidavit, and the affidavit that was attached to his motion for new trial stated the woman would not identify the source of her information. No juror has been identified as having provided the information. Moreover, other than San Miguel being found guilty of the offenses, the sentencing information was not only wrong, but the sentencing portion of San Miguel's trial had also not begun, making it impossible for the jury to be determining his sentences at that time.

To obtain a motion for new trial based on juror misconduct, an appellant must allege facts that amount to misconduct "through the affidavit of a juror or another person who was in a position

to know the facts." *Prystash v. State*, 3 S.W.3d 522, 537 (Tex. Crim. App. 1999) (citation omitted); *see Prince v. State*, 254 S.W.2d 1006, 1011 (Tex. Crim. App. 1953) ("Where the misconduct was of such a nature that it would be known only by members of the jury, then an affidavit of a juror is proper. But this is not the exclusive method. Where the appellant is unable to secure such an affidavit, it is incumbent upon him to show this, and why [the appellant could not obtain an affidavit;] and, further, to show reasonable grounds for believing that such misconduct actually occurred."). "This [c]ourt has required something more than a mere allegation of juror misconduct to avoid fishing expeditions by defendants." *Prystash*, 3 S.W.3d at 537 (citations omitted).

San Miguel failed to satisfy his burden. *See id.* Under these facts, we cannot conclude the trial court abused its discretion by denying San Miguel's motion for new trial. *See Najar*, 618 S.W.3d at 371.

We overrule San Miguel's issue concerning jury misconduct based on the alleged early disclosure of his guilty verdicts and sentence prior to being read by the trial court in open court.

## CONCLUSION

Having overruled all of San Miguel's issues, we affirm the trial court's final judgments of conviction.

Irene Rios, Justice

DO NOT PUBLISH